WARREN C. WINGET *et al.*

*v.*

THE QUINCY BUILDING AND HOMESTEAD ASSOCIATION.

*Filed at Springfield April 5, 1889.*

1. BUILDING ASSOCIATIONS—*act of 1872—constitutionality—special law regulating interest.* The 10th section of the Building Association act of 1872 is not in conflict with the provisions of section 22 of article 4 of the constitution, which prohibits the General Assembly from passing any local or special laws regulating interest on money.

2. SAME—*regulations in respect to loans—validity.* Rules of a building association organized under the act of 1872, that no loans shall be made except to members; that loans shall be put up at auction, and struck off to the members bidding the highest premium; that every share of stock shall be subject to a lien for the payment of unpaid in-

stallments and other charges incurred thereon; and that no stockholder shall withdraw from the association whose stock is held in pledge for security, are authorized by the statute, and are therefore legal and valid.

3. So a by-law providing that when the shares of stock of any series upon which a loan should be granted should reach the matured value of $100 each, the value of the stock should be credited to the account of the borrowing member, is valid, and warranted by the act. By this mode the loan is satisfied and discharged, and the stock so credited is cancelled, and reverts to the association.

4. SAME—*fraud—representations to induce member to take a loan.* A building association, by its circulars, set out the advantages of its financial scheme to men of small income. The representations were mostly laudatory, and in many respects the expression of opinion, but none of them, as to any material fact, were shown to be untrue. The party seeking to rescind his contractual relation with the association, on the ground that he was misled, and thereby defrauded, by becoming a member, had a copy of the charter and by-laws of the association, in which the rights and obligations of members, etc., were fully stated. His failure to realize the contemplated benefits represented was owing to his own imprudence and neglect: *Held,* not such a fraud as to justify a rescission of the contract with the association.

5. ESTOPPEL—*to question validity of corporation.* A party who has contracted with a corporation *de facto,* as such, can not be permitted, after having received the benefits of his contract, to allege any defect in the organization of such corporation, as affecting its capacity to enforce such contract, but all such objections, if valid, are available only on behalf of the sovereign power of the State. This rule applies when the corporation is organized under a law alleged to be unconstitutional.

APPEAL from the Appellate Court for the Third District;— heard in that court on appeal from the Circuit Court of Adams county; the Hon. WILLIAM MARSH, Judge, presiding.

This was a bill in chancery, brought by Warren C. Winget and Sarah M. Winget, his wife, against the Quincy Building and Homestead Association and William S. Flack, surviving trustee, to enjoin the sale of certain premises under the powers of sale contained in two deeds of trust executed by the complainants. The Quincy Building and Homestead Association is a corporation organized under the provisions of the "Act to

enable associations of persons to become a body corporate to raise funds to be loaned only among their members," approved April 4, 1872.

Said act, after prescribing the mode in which corporations might be organized for the purposes therein specified, provided, among other things not material here, that such corporations should make no loans except to their own members; that their shares of stock should be for $100 each, and that subscriptions therefor should be made payable to the corporation at such time or times as should be provided by the charter and by-laws, but that no periodical payment should exceed two dollars on each share; that every share of stock should be subject to a lien for the payment of unpaid installments and other charges incurred thereon under the provisions of the charter and by-laws, and that the by-laws might prescribe the form and manner of enforcing such lien; that new shares of stock might be issued in lieu of the shares withdrawn or forfeited, and that the stock might be issued in one or in successive series, in such amount as the board of directors might determine; that any shareholder wishing to withdraw from the corporation should have power to do so by giving thirty days notice of his intention so to do, and that he should be entitled to receive the amount paid by him and such interest thereon as the by-laws might determine, less all fines and other charges, but that no stockholder should be entitled to withdraw whose stock was held in pledge for security.

It was further provided that the money in the treasury, if over $100, should be offered for loan in open meeting at the meetings of the board of directors, and that the stockholder who should bid the highest premium for the preference or priority of loan should be entitled to receive a loan of $100 for each share of stock held by him, and that good and ample security should be given by the borrower for the repayment of the loan; that in case of non-payment of installments of interest by a borrowing stockholder for the space of six months,

payment of principal and interest, without deducting the premium paid or interest thereon, might be enforced by proceeding against the securities according to law; that a borrower might repay a loan at any time, and in case of such repayment before the expiration of the eighth year after the organization of the corporation, there should be refunded to him one-eighth of the premium paid for every year of said eight years then unexpired. It was also provided that no premium, fines or interest on such premium that might accrue to the corporation according to the provisions of said act should be deemed usurious, and that the same might be collected as any other debts of like amount might be collected by law in this State. Laws of 1872, page 173.

The Quincy Building Association was organized in April, 1874, its object, as declared by its charter, being, the accumulation of a fund by monthly contributions, fines, premium on loans and interest on investments, sufficient to enable the stockholders to build or purchase for themselves dwelling houses or improve real estate, or make such other investments as they might deem advantageous. A charter and by-laws were adopted in pursuance of which the stock of the corporation was divided into series, that issued for each year constituting a separate series, and it was further provided by the charter and by-laws that each stockholder, at the time of subscribing for stock, should sign his name to the charter, and that no member should own more than fifty shares in his own right; that the stock should be paid for in monthly installments of fifty cents per share, and that in default of payment of an installment at maturity, the stockholder should pay a fine of ten cents on a dollar or fraction of a dollar remaining unpaid, and that if the default in the payment of installments should continue six months, the stock should be forfeited, and the stockholder be entitled to receive the amount of installments previously paid in, after the deduction of all fines, and without the allowance of any interest; and that the payment of installments should·

continue until, with accumulated profits, the stock belonging to the series should be worth $100 per share.

It was also provided that each stockholder should be entitled to receive, for each share of stock held by him, a loan of not more than $100, such loan to be disposed of to the highest bidder for priority of right, in open meeting at stated meetings of the board of directors, interest to be paid at the rate of one-half per cent per month on the entire loan including the premium; that the repayment of such loan should be secured by bond and mortgage on real estate, clear of incumbrance, and that every share of stock upon which a loan should be effected should be transferred to the association as collateral security; that any stockholder might withdraw from the association upon giving thirty days notice of his intention so to do, and that he should then be entitled to receive the amount paid in by him and six per cent interest thereon, less all fines and other charges, but that no stockholder should be entitled to withdraw whose stock was held in pledge for security; that when the shares of stock of any series, upon which a loan should have been granted should reach the matured value of $100 each, the amount or value of such stock should be credited to the account of the borrower owning the same, and that the loan should be declared to be fully paid and satisfied and the stock cancelled.

On and for some time prior to the 3d day of May, 1876, the complainants were the owners as tenants in common of a certain lot of land in the city of Quincy with certain buildings thereon, and claimed by them as their homestead. Complainant Warren C. Winget was desirous of obtaining a loan of money from said association on the security of said lot, and in order to become a stockholder so as to be qualified to apply for such loan, he purchased and procured an assignment to himself from another stockholder of sixteen shares of stock of the second series, upon which installments to the amount of $88 had been paid. The certificate of stock thus purchased

was surrendered to the association, and a new certificate for sixteen shares was issued by the association to him. Winget thereupon made an application in writing to the association for a loan and appeared at a stated meeting of the board of directors and became a bidder for priority of right. His bid, which was thirty-eight per cent premium, was successful, and he thereby became entitled to a loan of $1600, less the premium bid, being the net sum of $992. The association thereupon paid over to him said sum of $992, and he assigned to the association his sixteen shares of stock as collateral security for said loan, and also executed his promissory note, bearing date May 3, 1876, by which he promised to pay to the association, said sum of $1600, eight years after date, with interest at the rate of one-half per cent per month, payable monthly, and also all monthly dues and fines on his sixteen shares of the capital stock of the association, his wife signing the note with him as his surety. To secure said note, said Winget and wife, on the same day, executed a deed of trust, by which they conveyed said lot to Rufus L. Miller, as trustee, and to William S. Flack, his successor in trust, with power of sale in case of default for six months in the payment of the moneys mentioned in said promissory note or any portion thereof. At the time of making the loan, the association delivered to Winget a pass-book, in which it afterwards entered credits for all moneys paid by Winget as such payments were made, and which contained a printed copy of the charter and by-laws of the association. This pass-book remained in his possession down to the commencement of this suit.

On the 6th day of November, 1878, Winget desiring to obtain a further loan on the same property, subscribed for four shares of stock of the fifth series and became a successful bidder for a priority at thirty-one per cent premium, and received from the association the net sum of $276, and assigned to the association as collateral security for said loan said four shares of stock and executed to the association his note for $400,

of like tenor with his former note, his wife also signing it as surety, and both joined in executing a second deed of trust on said lot to the same trustees, with like power of sale.

Winget, though frequently in default, so as to subject himself to the payment of fines, paid the installments on both certificates of stock, the interest on both notes, and the several fines incurred, down to February, 1882. The amounts paid by him on account of the first loan were as follows, viz: installments on the sixteen shares of stock $640, interest on the $1600 note $560, and fines $62.40. The amounts paid on account of the second loan were as follows, viz: installments on the four shares of stock $88, interest on the $400 note $78, and fines $12.70. The total amount of payments, including fines, was $1441.10. In February, 1882, he ceased making payments and sought to withdraw from the association, but he was not permitted to do so except upon terms which he was not willing to accept. After his payments had become more than six months in arrears, on application of the association, Flack, the successor in trust, Miller the trustee being dead, advertised said lot for sale under the powers in said deeds of trust, to pay the balance claimed by the association to be still due on said notes and deeds of trust. The balance claimed to be due on the two notes and for which the sale was advertised was $1082.55.

One of the principal grounds for relief alleged in the bill is, that complainants were induced to accept said loans and execute said deeds of trust through mistake and misunderstanding caused by false, and fraudulent representations by said association, its officers and agents. The evidence in relation to the representations alleged is to a considerable degree conflicting. Said representations consisted in part of certain printed statements and circulars issued and distributed by the association, and in part of oral statements claimed to have been made by the officers and agents of the association to the complainants at or prior to the execution of the deeds of trust.

Of the former, a printed circular was produced and identified, and those portions of it which were deemed material were read in evidence and are as follows :

"Within the past few years Building Associations have been organized in the west, and naturally they are new, and the people are as yet unacquainted with the work and the benefits they accomplish. The name Building Association is a misnomer. Strictly speaking they are mutual savings and loan associations, loaning the money invested by their members to their members only.

"The Quincy Building and Homestead Association organized in May, 1874, has been before the people of Quincy for the past nine years, and has been the means of assisting a large number of workingmen to gain them a home by means of monthly payments equal to paying rent. And you will ask how is this done ?

"The association issues a series of stock on the first Tuesday of June annually, each share of stock being of the value of $100 when par. Any person can subscribe from one to fifty shares of stock, and by paying on each share the sum of fifty cents monthly, will realize the full value of $100. You will ask, how can fifty cents paid monthly, say for nine years, which would be $54, realize $100 ? It is done in this way : The money which is paid monthly is loaned to the members and the interest received on their loans is also paid monthly, hence the association compounds the interest twelve times per year, besides fines which are collected from delinquent members. Every one knows what results can be obtained by the loan and re-loan of money during a series of years. The profits are equally divided among the shareholders without preference. The expense of management is small, the directors giving their time, and the secretary and treasurer are only paid a nominal salary. Now by what means can a home be secured ?

"The association is in itself a philanthropic institution, and being of itself purely mutual, invites the laborer, mechanic,

clerk and tradesman to share and assist each other in procuring a home. This association does not build houses, but helps those who help themselves in procuring one for them, the object being to loan to worthy mechanics, laborers and others sufficient money in the erection of a house, and to protect all its members, it is necessary that the association require security of all borrowers. Suppose you own a lot but have not the requisite amount of money necessary to build a house. The association will loan a sufficient amount to do so; or perhaps you have neither a lot or sufficient money to purchase one, but still it may be your desire to have your own house. You can do this by subscribing for stock and paying thereon until it is worth say $200. You can then withdraw the same from the association and with that money apply it in the purchase of a lot; or you can borrow from the association that amount by pledging the stock as security, or you can borrow a larger amount by giving the property as security, and with the surplus build your house. The association always takes into consideration the value of your stock when making a loan.

"Besides this, many worthy persons can not borrow from money loaners or brokers a sufficient sum to enable them to build or purchase a house, as they require nearly double the amount as security, besides not loaning for a longer period than two or three years, a period of time not sufficient for a laboring man with a limited income to repay the loan, and they will not receive part of the principal to convenience the borrower and to lessen his interest before the note has matured. Many people have a mortgage on their property which not alone has proved burdensome to them, but with a small income have found it impossible to repay it, and are obliged to make new loans when the old ones have become due, so as not to lose their property. To those this association offers a welcome, for by taking stock in this association and borrowing thereon, they can in a few years, by small monthly payments, rid themselves of a burden which has been to them a source

of anxiety. The record of this association for the past nine years speaks for itself. Hundreds of men have been and are now aided in the procurement of a home, and who, without the aid of the association, would now have no home of their own, but would be still paying rent.

"Every one knows what good influences are brought to bear in a community where the laboring classes are thrifty. Where every man has his own home a better class of citizens are always to be found. All that many of our laboring men are in need of is encouragement to become thrifty and to become their own landlords. In this the Quincy Building and Homestead Association now offers an opportunity. If at present you have not enough means to begin a purchase of a home, you may make an effort to save a few dollars a month for a beginning. Take shares in the association, as many as your income may permit you, and you will find in a short time that you will have a nucleus to buy a home; but if at any time you find that you are unable to meet your payments, you have the privilege to withdraw your stock. The association will return you the money you have paid at any time with six per cent interest thereon for the time invested. So you will then find yourself a gainer by having saved so much.

"To a great number of persons the ordinary method of paying so much a month is the easiest and most natural way of investing. They know their income, and they know what they can save out of it, and in a short space of time they find themselves possessed of a considerable amount which they very likely would not have, had they not invested small sums.

"Practically and in brief, the system operates to assist men of small means or small income to secure homes for themselves and their families, by paying small sums into a common treasury, to be loaned in such manner that principal and interest may be paid monthly instead of rent. The plan is simple. The theory is financially sound, and experience has demonstrated the material advantages which may be derived from

these corporate societies. Thus every member is both stockholder and depositor, and contributes to the management, to the capital stock and to the profits, while enjoying the use of the society's money.

"But in addition to the pecuniary benefits reaped from organizations of this kind, there are doubtless influences exerted upon their membership of even greater importance, both to the individual and to society. Men possess an instinctive desire to advance in life which governs all their actions, and needs only to receive the right direction. Given an opportunity to make small beginnings in thrift, and in proportion as men acquire habits of temperance and economy and begin to accumulate money or property, they become possessed with the dignity of citizenship, have new respect for themselves and the rights of others, and become identified through self interest with law, order and public stability.

"Such opportunities the Building and Loan Associations offer to the classes most in need of them. Capitalists can not monopolize them or divert them from their legitimate channels. All possible safeguards are thrown around them by the State laws, which specify the details of management, the limits of salaries and expenses, and place the control directly in the hands of the membership."

Another circular entitled "The Workingman's Way to Wealth," was inserted in a pamphlet containing the charter and by-laws of the association, and in that circular, the advantages of the system of loan and homestead associations provided for by the act of 1872, and especially those offered by the defendant association, were set forth as follows:

"It admits each individual member to a full, free and unrestricted voice in the management of associations formed under it, and a constant oversight of its operations and affairs.

"It is entirely mutual and equal in distributing its benefits, giving to all its members their equal portion of all its profits and gains.

"It is much more liberal in its return of profits and gains than any other plan of saving and accumulating from small sums of money, having no preferred class to share its profits, and no necessity for expensive banking houses and clerk hire, and it is the only plan by which the workingman can become his own capitalist, and create a source of wealth from which he can supply all reasonable demands without the aid or interference of the outside capitalist. In short, it is a system 'of the people, by the people and for the people.'

"Every one owning stock in this association is entitled to a loan of $100 for each and every share he may own, which is a permanent loan, provided for by the charter and by-laws of this association, thus enabling the workingman to anticipate his wants and provide for his family immediately, a task requiring long years of labor and saving under any other plan.

"Every stockholder, should he desire to withdraw, is assured by the charter of the repayment of the amount he pays into the association and legal interest.

"There is no separate class, and no advantage gained by one member over any other member."

In addition to these printed statements, evidence was given tending to show that the officers and agents of the association, made various statements and representations touching the advantages of being a stockholder in and a borrower from the association. The oral representations of which complaint is made, as collected and grouped together by counsel for the complainants in his brief, were as follows: "That it was cheaper to obtain a loan through the association than elsewhere; that it could be had at less than legal rates, and that he could pay it back in small amounts, which would render it easier for him than to pay it in a gross sum; that he would receive back in cash the discount or bonus he might bid and give notes for in excess of the money actually paid him, when his stock came to par; that complainants could pay off the loan at any time they wished to do so, by repaying the money

actually received and six per cent interest on it; that all the gains and profits of the association would be equally divided among all the stockholders without preference, when the stock in a given series in which the member held stock became par; that it was his duty to join the association and to obtain the money he wanted from it; that it was the easiest and best way for a poor man to obtain a home for his family."

The complainants' evidence tends to show that certain representations of the character above indicated were made to the complainants by Morton the secretary of the association, Miller its attorney and Nichols an assistant in the secretary's office. At the time the bill was filed Morton and Miller were dead, but Nichols was called as a witness and he directly disputed the complainants' testimony as to the representations claimed to have been made by him or in his presence.

The master found that the evidence as to the oral representations alleged in the bill was conflicting and unsatisfactory; that contradiction of the complainants' testimony in relation to the statements of Morton and Miller was impossible as they were dead, but that he was unable to find from the evidence that Morton, Miller or Nichols made the statements attributed to them except so far as such statements corresponded with the printed statements and circulars issued by the association and offered.in evidence.

The master found however that Winget became a member of the association and a borrower, and that he and his wife executed and delivered to the association the notes and deeds of trust in controversy, relying upon and putting faith in the representations made by the association, through its officers and agents, and through its printed publications and circulars, that it would be better and cheaper to take a loan from the association than to borrow elsewhere; that all the profits of the association would be shared equally by all the members; that it was a philanthropic and benevolent institution to aid mechanics and poor men to gain a home, and that its funds

were to be loaned only among its members, and that said representations were false and untrue.

The court thereupon entered a decree confirming the master's findings above set forth, and rescinding and vacating Winget's said certificates of stock in said association, and the contracts between him and the association which resulted in the association issuing to him and his accepting said certificates of stock, on the ground that Winget was induced to become a member of said association and take stock therein by false and fraudulent representations; and decreeing that the complainants were entitled to an accounting with said association upon the basis of the repayment by the complainants to the association of the moneys actually advanced by the association to Winget, with interest thereon at the rate of six per cent per annum, and crediting the complainants with all moneys paid by them or either of them to the association as installments of the shares of stock, interest or fines. The court thereupon stated the account between the parties from the evidence reported by the master, and it appearing from such statement of the account that the complainants had more than paid said moneys loaned by the association to Winget and interest thereon as aforesaid, a decree was entered perpetually restraining the association from further attempting to enforce said deeds of trust, and ordering said deeds of trust and notes to be surrendered up for cancellation, and also directing that all the costs of the suit be taxed against said association. On appeal to the Appellate Court this decree was reversed and the cause remanded with directions to dismiss the bill for want of equity. By a further appeal the record is brought to this court for review.

Mr. GEORGE W. FOGG, for the appellants:

A false representation of any material fact, made by one party, and the other, in ignorance of the truth, and in good faith, relies upon such false representation, and is thereby in-

duced to enter into a contract to his injury, will vitiate and avoid the contract, and if the injured party offers to rescind, and invokes the aid of a court of chancery, relief will be granted, and the parties restored to their original *status.* *Baker* v. *Rockabrand,* 118 Ill. 365.

Though the mistake may not be material, if it be such that the minds of the parties never met upon a material point, and the parties can not be put *in statu quo,* equity will rescind the agreement. 1 Story's Eq. Jur. sec. 138, note 3, secs. 142, 193, 185, and note.

As to what is such a *suggestio falsi,* in contemplation of a court of equity, see 1 Story's Eq. Jur. secs. 187-190.

It is the suppression or misunderstanding of a material fact, and not the intent to defraud, that gives a court of equity the right to rescind and abrogate the agreement of the parties. 1 Story's Eq. Jur. secs. 193, 193a.

The general rule is, that an act done or contract made under a mistake, or in ignorance of a material fact, is voidable in equity. 1 Story's Eq. Jur. sec. 140.

No matter what may be the form of a fraudulent transaction, nor however plausible it may be upon its face, a court of equity, with its utmost acuteness, will seek to discover the real motive or intention of the parties. *Hale* v. *Bryant,* 109 Ill. 34.

It is not necessary that the false representation should have been the sole or even the predominant motive. It is enough if it had material influence upon the plaintiff, although combined with other motives. *Safford* v. *Grout,* 120 Mass. 20; *Matthews* v. *Bliss,* 22 Pa. 48; *Hough* v. *Richardson,* 3 Story, 659; Pollock's Pr. of Con. 500.

Corporations are bound, to the same extent as are individuals, to a careful adherence to truth in their dealings, and they can not, by false representations, involve others in onerous engagements, and then defeat those expectations which their conduct has occasioned. *Zabriskè* v. *Railroad Co.* 23 How. 381; *Moran* v. *Miami County,* 2 Black. 722.

A stockholder drawn into taking shares in a corporation by the misrepresentation of its officers, can not be held to his contract, and the same doctrine applies to all the agents of a corporation. 1 Story's Eq. Jur. secs. 193, 193a; Pollock's Pr. of Con. 503-505.

That the loan in this case is usurious, see *Fitzsimmons* v. *Baum,* 44 Pa. St. 32; *Ernest* v. *Harkins,* 100 id. 551; *Evans* v. *Rigby,* 13 S. & R. 218; 46 Ga. 166; 41 id. 451; 54 id. 474; 69 Am. Dec. 161; *Delano* v. *Rood,* 1 Gilm. 690; *Hunter* v. *Hatch,* 45 Ill. 178; *Loveland* v. *Ritter,* 50 id. 54; *Columbia Building Association,* 78 Am. Dec. 463.

Messrs. EMMONS & WELLS, for the appellee:

A party seeking to avoid his contract for fraud must be free from negligence, (Wharton on Evidence, sec. 932,) and the evidence of the fraud must be clear and strong. *Fawcett* v. *Celoveer,* 109 Mass. 79; *Walker* v. *Hough,* 59 Ill. 375.

A knowledge of the falsity of the representation must rest with the party charged with the making of it, and he must use some means to deceive or circumvent. *Douglass* v. *Littler,* 58 Ill. 342; *Sims* v. *Kline,* Brew. 302.

If the acts of the officers of the association were mere assurances or expressions of an opinion, and not a misrepresentation of fact, however mistaken their belief has proven to be, there is no ground for holding such acts to be fraudulent. 2 Law and Eq. Rep. 401.

The false representation of an officer is not that of the company, even if made at the office. To become the act of the company, it must be contained in a report of the company adopted at a regular meeting. Redfield on Railways, p. 592, sec. 12; *In re Royal British Bank,* 3 L. S. (N. S.) 843.

Fraud, like any other fact, must be proven, and should not be inferred from mere expressions of opinion as to the merits of building associations. But representations false in fact, if innocently made by a party believing in the truth of what he

said, will afford no ground for relief. The concurrence of fraudulent intents and false representations, and damage resulting therefrom, constitute the ground of action. *Lamm* v. *Homestead Association,* 49 Md. 233.

It is now well settled that there can be no fraud without dishonest intention. Therefore, however false may be the representations of one party to another to induce him to make a contract, there is no ground for avoiding it as obtained by fraud, if the party making the representations honestly believed them to be true, although other remedies are sometimes available for damages. *Cooper* v. *Lovering,* 106 Mass. 78.

If the representations were honestly made, then they must relate to the substance of the whole consideration, in order to be relieved; otherwise, if the representations are fraudulently made. *Street* v. *Blay,* 2 B. & Ad. 456.

Ordinarily, statements of a general character, made by either of the parties pending a negotiation for the sale of property, relating to its value, will not afford any ground for avoiding the sale, although false, and made with a fraudulent intent. *Dillman* v. *Nadlehoffer,* 119 Ill. 567; *Smoke Consuming Co.* v. *Lyford,* 123 id. 300.

Dealer's talk, although false, is not actionable. *Kimball* v. *Bangs,* 144 Mass. 321.

Fraud must be proved, and proved as it is alleged. Kerr on Fraud and Mistake, 382, 383.


Mr. JUSTICE BAILEY delivered the opinion of the Court:

One of the grounds upon which the complainants seek to be relieved from the legal consequences of Winget's membership in the Quincy Building and Homestead Association, and from the obligations created by the notes and deeds of trust executed by them to said association is, that the association has no valid legal existence. In support of this contention they insist that the act of 1872 under which said association was

organized is unconstitutional and void, because the entire scope of the act, as is claimed, is not sufficiently expressed in the title. On this point it is sufficient to say, that whatever may be the fact in relation to the valid legal existence of said association as a corporation, the complainants are not in a position in which they can be permitted to challenge its validity. A party who has contracted with a corporation *de facto* as such, can not be permitted, after having received the benefits of his contract, to allege any defect in the organization of such corporation, as affecting its capacity to enforce such contract, but all such objections, if valid, are available only on behalf of the sovereign power of the State. 2 Morawetz on Corporations, sec. 750, and authorities cited in note. And this rule applies even where the corporation is organized under a law alleged to be unconstitutional. *Friedland* v. *Pennsylvania Central Ins. Co.* 94 Pa. St. 504; *McCarthy* v. *Lavasche*, 89 Ill. 270; *Dows* v. *Naper*, 91 id. 44; Morawetz on Corporations, secs. 759, 760.

It is also contended that the loans of money for which said notes and deeds of trust were given are usurious. It is claimed that the rate of interest reserved was in excess of that allowed by the general interest laws of the State, and that the tenth section of the act of 1872 is in conflict with the provisions of section 22, article 4, of the Constitution which prohibits the General Assembly from passing any local or special laws regulating the rate of interest on money. The questions here raised were fully considered by this court in *Holmes* v. *Smythe*, 100 Ill. 413, and it was there held that the said section of the act of 1872 was not within the prohibition of the Constitution, and that the transaction under consideration in that case, which in all its material aspects was precisely similar to those now before us, was not usurious. As we held in *Freeman* v. *Ottawa Building, Homestead and Savings Association*, 114 Ill. 182, these questions are no longer open to discussion.

The principal controversy arises upon the charges of fraud and misrepresentation whereby, as it is claimed, Winget was induced to become a member of said association and to apply to it for said loan of money, and whereby Winget and wife were induced to execute to the association their notes and deeds of trust as security for said loans. The evidence bearing upon these charges is quite voluminous and to a considerable degree conflicting, but after having given it patient consideration, we are disposed to concur with the decision of the Appellate Court that said charges are not sustained.

The form of organization of the association, and the general scheme upon which its business is conducted, are, so far as we are able to perceive, in strict accordance with the provisions of the act of 1872, and they must therefore be held to be fully authorized by law. Thus, the rules that no loans should be made except to members; that loans should be put up at auction and struck off to the members who should bid the highest premium; that every share of stock should be subject to a lien for the payment of unpaid installments and other charges incurred thereon under the provisions of the charter and by-laws, and that no stockholder should withdraw from the association whose stock was held in pledge for security, are all based directly upon the act. The by-law providing that when the shares of stock of any series upon which a loan should be granted should reach the matured value of $100 each, the value of the stock should be credited to the account of the borrowing member, thus satisfying and discharging the loan, and that the stock so credited should thereupon be cancelled and revert to the association, furnished a mode of satisfying loans and adjusting the accounts between the association and its borrowing members which was entirely consistent with and warranted by the provisions of the act.

Most if not all the representations complained of were made with reference to and in laudation of the financial scheme authorized by said act and adopted and put in practice by the

association. The evidence in relation to the representations alleged to have been made orally is conflicting, and we are of the opinion that the master was correct in pronouncing it unsatisfactory, and in declining to find that any of the representations imputed to the officers and agents of the association were in fact made, except so far as they corresponded in substance with those contained in the printed circulars issued by the association. It remains to be seen whether said circulars contained misrepresentations of such character as should call for a rescission of the contractual relations between the parties.

There can be no doubt that the association, by said circulars, presented the advantages to laboring men and others having small incomes, of its financial scheme, in a somewhat roseate light, and that opinions were expressed which, when subjected to the test of experience, have proved to be fallacious. But we are unable to find in said circulars any statement or representation of any material fact which is shown by the evidence to be essentially untrue. Besides, Winget, at the time he became a member of the association, or before, was furnished with a printed copy of the charter and by-laws of the association, in which the rights and obligations of members, and the principles upon which loans of money were made and secured were fully stated. He had thus in his own hands the means of ascertaining and judging for himself as to the desirability of membership in the association, and as to the advisability of seeking to obtain from it loans of money. The first loan was obtained May 3, 1876, and after an interval of a little more than two years and a half, during which he must be deemed to have had sufficient opportunity to investigate the soundness and honesty of the financial methods adopted by the association, and the truthfulness of its representations, he applied for and obtained a further loan upon like terms and giving the same kind of security as before. It is difficult to see how, under these circumstances, even if the circulars should be found to contain statements of fact which were false and misleading, the com-

plainants could be permitted to rescind their contracts on the ground of fraud.

The alleged misrepresentations upon which chief reliance is placed are, that it would be better and cheaper for Winget to obtain a loan from the association than to borrow elsewhere, and, that all the profits of the association would be shared equally by all the members. The first of these representations would seem to be a matter of opinion rather than the statement of a fact; but waiving that consideration, its failure to prove true in the case of Winget's loans results from two causes, first, the large premiums bid by him for the loans, and second, the frequent fines incurred by him by reason of his failure to pay his installments at maturity. It is needless to say that the fines which he had to pay were the result of his own negligence, and should not enter into the computation in testing the truthfulness of the representation. The premiums bid and paid were very large, the first being thirty-eight and the second thirty-one per cent of the amount of the proposed loan, and such premiums being paid by him voluntarily and with his eyes open, their effect upon the general result was a matter for which he was responsible equally with the association. If it be said that, under the circumstances, the loans could be obtained only by paying the premiums bid, it need only be replied that he was under no coercion, and was not compelled to take the loans if the rates of premium were bid up to a figure which would make them too expensive.

It is demonstrable that if Winget had incurred no fines and had paid no premiums or but small ones, the loans would have been more advantageous than if made at the then usual rate of interest. Thus, if no premium had been paid and the stock had become par in eight or nine years, which the evidence shows was the usual period, the loans would have been almost or quite without interest. The payments in eight years would aggregate only ninety-six and in nine years only one hundred and eight per cent of the face of the loans, and as the

stock would then equal in value the principal of the loan, the indebtedness would be cancelled by a credit of the par value of the stock and no further payments would be required. That this result was impossible in Winget's case was due solely to the large premiums bid and the numerous fines incurred.

We are unable to see that the representation that the profits of the association would be shared equally by all the members was in any degree untruthful. All the profits arising out of the funds belonging to a particular series of stock were accumulated and held until that series of stock became par, and then all members holding stock in that series were alike entitled to a credit to the amount of the par value of their stock. If the stockholder was not also a borrower, the par value of his stock was paid to him in cash. If he was a borrower the same amount was applied to the cancellation of his loan.

After fully considering the case, we are satisfied with the conclusion reached by the Appellate Court, and the judgment of that court will therefore be affirmed.

*Judgment affirmed.*