JULIEN, Appellant, vs. MODEL BUILDING, LOAN & INVEST-
MENT ASSOCIATION, imp., Respondent.

MODEL BUILDING, LOAN & INVESTMENT ASSOCIATION, Re-
spondent, vs. JULIEN, imp.,.Appellant.

*November 29—December 16, 1902.*

*Building and loan associations: Mortgages: Election to declare
whole debt due: Service of notice: Constitutional law: Equal
protection of the laws: Special legislation: Title of act: Stat-
utes: Implied repeal: Public policy.*

1. .The rule in Wisconsin, that a mortgagee, who, by reason of some
default and under an option permitting such action in advance
of maturity of the debt, seeks to foreclose his mortgage, must
exercise his election and give notice thereof to the mortgagor
before bringing suit, is a rule of equity, and, in the absence of
some express or implied contract for such notice, a mortgagor,
who has left his usual place of abode without making any pro-
vision for the forwarding of his mail; and without giving the
mortgagee notice of change of address, is *held* to have waived
giving any better notice than by mail, addressed to his usual
place of abode last known to the mortgagee.

2. Sec. 2014—5, Stats. 1898, giving to mortgages of building and
loan associations priority over liens upon the mortgaged prem-
ises, *filed* subsequent to the recording of the mortgage, is not
repugnant to sec. 1, art. XIV, U. S. Const., prohibiting any state
from making or enforcing any law which shall deny to any per-
son within its jurisdiction the equal protection of the laws.

3. Sec. 2014—5, Stats. 1898 (ch. 368, Laws of 1897, entitled "An act
regulating building and loan associations"), is not a private or
local law, within sec. 18, art. IV, Const., prohibiting the legisla-
ture from enacting any private or local law containing more
than one subject, which must be stated in the title.

4: Ch. 368, Laws of 1897 (sec. 2014—5, Stats. 1898), entitled "An act
*regulating* building and loan associations," reasonably suggests
the means deemed necessary or appropriate to the efficient ad-
ministration of their business and the status of their mortgage
liens, as regards other liens on the property affected, within the
prohibitions of said sec. 18, art. IV, Const.

5. Under sec. 18, art. IV, Const., providing that the subject of any
private and local law must be stated in its title, the statement
of the subject is purely a legislative function, and in that re-
spect the legislature is unrestricted so long as language is used

which, in any reasonable view, can be said to state such subject matter.

6. Sec. 3314, Stats. 1898, making mechanics' liens date from the commencement of the work, was part of the revision of 1878, and re-enacted as ch. 380, Laws of 1897, which last act is of later date than ch. 368, Laws of 1897 (sec. 2014—5, Stats. 1898), giving mortgages of building and loan associations priority over other liens on the mortgaged premises filed subsequent to the recording of the mortgage. Sec. 4985, Stats. 1898, declares that the provisions of the revision of 1898, so far as they are the same in substance as those of existing laws, shall be construed as a continuation of such laws and not as new enactments. *Held*, that since ch. 380, Laws of 1897 (sec. 3314), contained no repealing clause, and was only enacted to give immediate effect to certain sections of the revision of 1898, it cannot be said to repeal ch. 368, Laws of 1897 (sec. 2014—5, Stats. 1898), although repugnant thereto and enacted later.

7. A constitutional legislative enactment cannot be rightly spoken of as contrary to public policy.

APPEAL from a judgment of the circuit court for Milwaukee county: EUGENE S. ELLIOTT, Circuit Judge. *Affirmed.*

Action to enforce a lien on real estate under sec. 3314, Stats. 1898, as to the owner of two mortgages on the property, and other persons; and an action by the mortgagee against the lien claimant and such others to foreclose the mortgages. The actions were tried together on the issue raised by the answer of the mortgagee to the complaint in the lien action, and the answer of the lien claimant in the suit to foreclose the mortgages, as to whether such mortgages were encumbrances upon the property, affected by both claims, superior to the lien.

The following points were decided by the trial court, omitting formal matters as to which there is no dispute: May 25, 1899, defendants Mary Siebert and Frank Siebert, her husband, for value gave the *Model Building, Loan & Investment Association,* a corporation organized under the laws of this state and of the character its name indicates, their bond to secure the payment of $3,000 with interest, and as collateral security thereto gave the association a mortgage in the ordi-

nary form, dated on such day, on the premises described in the complaint, which said mortgage, on the day of the date thereof, was duly recorded. It was provided in the bond, among other things, that in case of any default in the conditions thereof existing for the space of six months, or the obligor suffering a mechanic's lien to accrue or be filed against the mortgaged property, the entire indebtedness should, at the option of such association, become due. The provisions of the bond, in addition to the one particularly mentioned, are in harmony with the usual methods of dealing between a building and loan association and its borrowing members. The amount due upon the bond and mortgage is $3,542.38, with interest from the date of the findings, which sum the association is entitled to recover. On January 2, 1901, the conditions precedent to the right of the association to declare due the entire amount secured by the bond and mortgage existed, and it exercised its option in that regard by mailing copies of a notice of election in the matter to each of the debtors at their respective postoffice addresses in the city of Milwaukee, with the postage prepaid thereon. Facts similar to those mentioned exist as to the second bond and mortgage declared on in the foreclosure complaint and in the answer of the association in the lien action, for $1,000. Such mortgage was given by the Sieberts to the association December 16, 1899, and was duly recorded December 19, 1899. The amount the association is entitled to recover on such bond and mortgage is $365.21, with interest thereon from the date of the findings. Facts exist, alleged in the complaint in the lien action, entitling the plaintiff therein to a lien under sec. 3314, Stats. 1898, for $199.67. The lien petition was filed July 19, 1900. The lien dates from September 15, 1899, subject to whatever right of priority the association has under sec. 2014—5, Stats. 1898, which provides that mortgages upon real estate, taken by such associations, shall take precedence over all liens

upon the mortgaged premises filed subsequent to the recording of such mortgages. The court decided as a matter of law that by force of such statute the plaintiff's lien was subordinate to the two mortgages, and ordered judgment of foreclosure of the mortgages, with suitable provisions for the protection of the lien claimant and other defendants interested in the property. The lien claimant appealed.

*M. N. Lando,* for the appellant.

For the respondent there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas,* and oral argument by *F. H. Remington.*

MARSHALL, J. The necessity of notice of election, by a creditor to his debtor, to exercise an agreed option to treat an entire indebtedness as due before the date specifically named in the papers evidencing the same and securing its payment, for nonperformance of some stipulation of the contract, as a condition precedent to the use of judicial remedies for collection of the whole debt, is merely a rule of equity. In most jurisdictions no such notice is necessary. It is held that if the debtor makes default he is neither legally nor equitably entitled to notice that by reason thereof the creditor will consider the debt all due, before judicial remedies are resorted to to collect the same, unless such a notice is specifically provided for in the contract; that it is not the business of the courts to supply an element in the contract, by an arbitrary rule of construction, which the parties see fit to omit, because, without it, the contract would seem to be a harsh one. This court stands alone, or nearly so, in holding that notice of election should be given the debtor as a condition of treating the contract as fully matured; but its decision in that regard is not based upon a construction of the contract. 2 Pingrey, Mortg. § 1539; Jones, Mortg. § 1182*a,* and cases cited. Pingrey is in error in classing California with this state on the subject. He cites *Monroe v. Fohl,* 72 Cal. 568, 14 Pac.

514, where the subject of necessity of notice before suit brought was not considered, the sole question being, What are the essentials of notice where one is required? In subsequent cases that court distinctly held that no notice is necessary unless specially required by the terms of the contract. *Hewitt v. Dean,* 91 Cal. 5, 27 Pac. 423; *Sichler v. Look,* 93 Cal. 600, 29 Pac. 220. In *Hewitt v. Dean* this language was used:

"It was competent for them to include in their note or mortgage a provision requiring notice of such election as a condition precedent to instituting the suit; but instead thereof they have agreed that upon the mere fact of the default the plaintiff may, at his option, treat the whole amount as due, and foreclose the mortgage. To add to this agreement the requirement that the plaintiff shall give notice of the election would be for the court to add to the agreement of the parties a condition which they have not themselves chosen to make."

The rule here was first distinctly stated in *Basse v. Gallegger,* 7 Wis. 442. It was not based upon judicial or other authority. The decision is not in conflict with those we have cited and many other cases that might be mentioned, as regards reading a requirement for notice out of the contract by construction. The rule was declared, as before indicated, as a rule of equity, to be applied where a person seeks its jurisdiction to enforce his mortgage to the full extent, under an option so to do, by reason of some default in the terms thereof. This language was used:

"It seems to us but just and proper to require the mortgagee, in cases like the present, to exercise his election, and give notice thereof to the mortgagor, before bringing suit."

There is no disposition to recede from a doctrine so long established, or even to criticise it. The state of the law in general has been referred to merely to show that decisions as to what is sufficient notice of election to exercise the option, in a case where notice thereof is required by the contract either expressly or by implication, are not controlling where

the requirement for such notice is not a matter of contract but a mere condition of the use of the equity jurisdiction to enforce the security. No doubt the rule that he who asks equity must do equity led to the adoption of the judicial policy of this state. If a person who, under ordinary conditions, is entitled to the benefit of the rule, is guilty of conduct toward his creditor rendering compliance by the latter unnecessarily burdensome, as by secreting himself, so notice of the election to treat the whole debt due cannot be served upon him, or by leaving his usual place of abode without acquainting his creditor where he can be reached by mail or otherwise, or making any provision for obtaining mail addressed to him at his last known place of residence,—he cannot be heard to complain that injustice was done him by his creditor's noncompliance with the rule. He will be deemed to have waived such compliance, or forfeited it. The equitable considerations which led the court to adopt the policy appellant invokes, justify, if they do not demand, the countervailing rule we have suggested, protecting the creditor against danger of having the value of his contract unnecessarily diminished by negligence or wilful misconduct on the part of the debtor, rendering it unreasonably difficult for the former to comply with the judicial rule designed for the latter's protection.

The claim here made is that proper notice of election to treat the entire indebtedness due was not given to the debtors, wholly on the theory that, prior to the time notices were mailed to them at Milwaukee, Wisconsin, their post-office address when the indebtedness was contracted and for a considerable period of time thereafter,—they had changed their place of abode to some unknown point outside the state. Assuming in appellant's favor, for the purpose of the point under discussion, that the evidence shows all that is claimed for it, we think the debtors, by their conduct, waived the giving of any better notice to them than the one given. If

they made no arrangement, upon departing from the state, to have mail addressed to them at Milwaukee, Wisconsin, forwarded to them, and gave their creditor no information as to where they could be reached in some better way than by letter addressed to them at their old post-office address, they have no standing in equity to complain that they were brought into court to defend against a claim that the whole indebtedness was due, in advance of being notified of the exercise by their creditor of its option in the matter; and, obviously, persons claiming under them, circumstanced as appellant is, can have no better right than they.

Sec. 1, art. XIV, of the United States constitution, providing that, "No state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws," does not preclude state legislation applicable only to a particular class of persons, if there is a reasonable ground for treating such class of persons different from the general mass. That constitutional provision was so construed by the supreme court of the United States early after its adoption, and the construction steadfastly adhered to up to the present time. *Soon Hing v. Crowley,* 113 U. S. 703, 5 Sup. Ct. 730; *Barbier v. Connolly,* 113 U. S. 27, 5 Sup. Ct. 357; *Missouri P. R. Co. v. Humes,* 115 U. S. 512, 6 Sup. Ct. 110; *Missouri P. R. Co. v. Mackey,* 127 U. S. 205, 8 Sup. Ct. 1161; *Bell's Gap R. Co. v. Pennsylvania,* 134 U. S. 232, 10 Sup. Ct. 533. In *Barbier v. Connolly,* the court, speaking by Mr. Justice FIELD, said:

"Neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having these objects in view, must often be had."

In *Missouri P. R. Co. v. Mackey, supra,* referred to in respondent's brief, this language was used:

"The greater part of all legislation is special, either in the object sought to be attained by it or in the extent of its application. . . . When legislation applies to particular bodies or associations . . . it is not open to objection that it denies to them the equal protection of the laws if all persons brought under its influence are treated alike under the same conditions."

Legislative discretion to classify persons for the purposes of legislation is substantially the same under the fourteenth amendment of the federal constitution as under the state constitutional provision prohibiting special legislation. The rules on the subject, which generally prevail, and which have received the sanction of this court, are as follows: (1) All classification must be based upon substantial distinctions which make one class really different from another. (2) The classification adopted must be germane to the purposes of the law. (3) The classification must not be based upon existing conditions only; it must not be so constituted as to prevent additions to the number included within the class. (4) To whatever class a law may apply, it must apply equally to each member thereof. *Johnson v. Milwaukee,* 88 Wis. 383, 60 N. W. 270. Whether any particular classification made by the legislature satisfies those requisites is primarily a legislative question. The field covered by its discretionary power in the matter is very broad. It is, of course, not above judicial control, but is safe from restraint so long as any reasonable ground can be discovered to support it. The court can apply no test to the matter except the constitutional test. That of the mere wisdom of the measure is exclusively for legislative consideration.

If we were called upon to apply the law as above stated, without the aid of judicial authorities, to sec. 2014—5, Stats. 1898, giving to mortgages of mutual building and loan associations priority over other liens upon the mortgaged premises

and the buildings and improvements thereon, filed subsequent
to the recording of the mortgage, for the purpose of determin-
ing whether such legislation is constitutional, it would stand
the test.   The supposed dominant purpose of building and
loan asociations is to promote, by means of the mutual efforts
of a large number of persons, the ownership of homes in sev-
eralty for themselves and families.   The acquirement and en-
joyment, in an individual way, free from hostile demands of
creditors, of the comforts of life, was deemed to be of sufficient
importance to the state at the time of the adoption of the con-
stitution, that a mandate was embodied in it requiring the
legislature to promote safe proprietorship in that regard by
wholesome laws.   Certainly, laws reasonably calculated to
promote the acquirement and safe enjoyment of homes are
within the spirit of that constitutional provision.   The legis-
lative policy of the state, embodied in our statutes, shows that
it has always been so regarded.   Upon that ground alone, if
upon no other, the law in question would be safe from con-
demnation as being unconstitutional class legislation.   But,
independently of such constitutional recognition of the im-
portance of promoting individual security from loss of the
comforts of life by hostile demands of creditors, the social in-
stinct suggests home building and proprietorship in an indi-
vidual way, as strongly as any one thing that can be men-
tioned in the economy of nature, which is not given to us from
its bounty without effort on our part to secure it.   Nothing
contributes more to the prosperity of a people, individually
and collectively, than the general satisfaction of the desire for
home ownership, which all must admit is universal, as we
have indicated.   Hence, a law applicable to a class of cor-
porations designed primarily to administer to that desire, can-
not be reasonably said to be unconstitutional because the
classification is not legitimate.   The law in question seems to
satisfy all the essentials of one applicable only to a particular
class of persons, so as to remove it safely beyond the condem-

nation of the fourteenth amendment of the national constitution.

The conclusion reached by courts elsewhere is in harmony with the views above expressed. *McLaughlin v. Citizens B., L. & S. Asso.* 62 Ind. 264; *Shaffrey v. Workingmen's S., L. & B. Asso.* 64 Ind. 600; *Holmes v. Smythe,* 100 Ill. 413; *Freeman v. Ottawa B., H. & S. Asso.* 114 Ill. 182, 28 N. E. 611; *Winget v. Quincy B. & H. Asso.* 128 Ill. 67, 21 N. E. 12; *Security L. Asso. v. Lake,* 69 Ala. 456; *Vermont L. & T. Co. v. Whithed,* 2 N. Dak. 82, 49 N. W. 318. In most of the cases cited the question whether it was constitutional to make building and loan associations a class by themselves for legislative regulation of interest charges was the one considered; but certainly classification on that subject would not have better reason to support it than classification as regards priority of liens. In the case last cited this language was used:

"Operations of building and loan associations, when confined to their own members, differ so radically from ordinary loan transactions that the legislature was clearly warranted in placing such associations in a separate class for the purposes of such legislation as pertains to interest and usury."

Counsel for appellant calls attention to some authorities contrary to the views we have expressed, particularly *Gordon v. Winchester B. & A. F. Asso.* 12 Bush, 110. We have examined them all, and many other authorities, which we do not deem necessary to specially mention here. In our judgment the better reasoning and the greater weight of authority is in harmony with the conclusions we have reached.

The law under which respondent's mortgage lien was adjudged superior to appellant's lien under sec. 3314, Stats. 1898, is ch. 368, Laws of 1897. It is entitled "An act regulating building and loan associations." It is suggested that the term "regulating," with its context, does not suggest that feature of the body of the act relied on by respondent neces-

sary to its judgment, hence that, as regards such feature, at least, the law is fatally defective under sec. 18, art. IV, of the constitution, which prohibits the passage of any private or local law containing more than one subject, which must be stated in its title. There are two sufficient answers to that: (1) The law is plainly not a private or local law. It is a general law as distinguished from a local law as the latter term is used in the section under consideration. It has none of the characteristics of a private act. A law applicable to a special class of persons is a public and general law. *Milwaukee Co. v. Isenring*, 109 Wis. 9, 85 N. W. 131. (2) The title to the act suggests, reasonably, in our judgment, any means deemed by the legislature necessary or appropriate to the efficient administration of the business of building and loan associations. Obviously, the status of their mortgage liens, as regards other liens on property affected, falls within that field. The technical meaning of words used in the title to a law cannot be safely taken to mark the limits of the enactment. The broadest meaning of which the words are reasonably susceptible under the circumstances must be given to them, since the constitution leaves to the legislature unrestricted authority respecting the manner in which the subject of a law shall be stated in its title, so long as language is used which in any reasonable view can be said to state such subject. The statement of the subject is purely a legislative function. Courts cannot condemn the exercise thereof because, in their judgment, it might have been exercised better. The limit of judicial authority is to determine whether there was a failure to exercise the legislative function in the given case. *Diana Shooting Club v. Lamoreux*, 114 Wis. 44, 89 N. W. 880.

A suggestion is made by appellant's counsel that the provision of sec. 3314, making liens of the character of appellant's date from the time of the commencement of the building regardless of when the work for which the lien is claimed was done or the material furnished, was re-enacted in August,

1897, by ch. 380 of that year; that such chapter, being a later act than the one upon which respondent's judgment depends, repeals so much of such act as is repugnant thereto. The conclusive answer to that is that the feature of sec. 3314 upon which counsel for appellant relies did not originate with ch. 380, Laws of 1897. It is as old as the Revised Statutes of 1878. The only purpose of ch. 380, Laws of 1897, was to give immediate effect to certain sections of the new revision of the statutes which went into effect as a whole in September, 1898. It contains no repealing clause and was not intended to operate to repeal any existing law carried forward into the new revision, and by such revision to re-enact such law. In the general act giving effect to the new statute, passed at the same time as the special act under discussion, it was expressly provided that:

"The provisions of these revised statutes, so far as they are the same in substance as those of existing laws, shall be construed as a continuation of such laws and not as new enactments." Sec. 4985, Stats. 1898.

In that the legislature only voiced the unwritten law. *Laude v. C. & N. W. R. Co.* 33 Wis. 640; *Gilkey v. Cook,* 60 Wis. 133, 18 N. W. 639; *Cox v. North Wis. L. Co.* 82 Wis. 141, 51 N. W. 1130. But its action, in connection with the absence of any repealing clause in ch. 380, Laws of 1897, indicates clearly that the enactment of such chapter was not intended to give existing laws which were continued, the character of original legislation; but that the contrary is expressly negatived.

The further claim is made that the law in question is contrary to public policy. We know of no ground upon which a constitutional legislative enactment can be rightly spoken of as contrary to public policy. What is and what is not public policy must obviously be determined by the written and the unwritten law, giving precedence to the former where the two are in conflict. We sometimes say that a contract is void be-

cause contrary to public policy, in that it is contrary to the policy of the law. Laws are never said to be contrary to public policy in any other sense than contrary to constitutional policy. To illustrate, a promissory note made on Sunday is said to be void, not because expressly made so by any written law, but because it is a penal offense to transact business on the Sabbath day. *Howe v. Ballard,* 113 Wis. 375, 89 N. W. 136; sec. 4595, Stats. 1898. We look to the statute in testing the validity of the note. It does not in terms condemn it as void, but it prohibits the doing of business, which includes the making of a note; therefore the giving thereof on the Sabbath day is contrary to the policy of the law, in other words, contrary to public policy, hence judicial remedies cannot be invoked, successfully, to enforce it. Statutes are not tested by any rule of public policy. We look to the statutes as well as the unwritten law to determine what is and what is not public policy, and then we test acts *inter partes* by the result. If such acts are not directly the subject of legislation, we say they are contrary to public policy. When we leave constitutional limitations out of view, the will of the legislative branch of the government, when expressed, is the highest evidence of public policy. To judicially condemn its expressed will, when exercised within constitutional limitations, would be the plainest kind of usurpation. Baron PARKE, in *Egerton v. Brownlow,* 4 H. L. Cas. 122, 123, expressed the same idea substantially thus:

'It is the province of the statesman and not of the lawyer to discuss, and of the legislature to determine what is best for the public good, and to provide for it by proper enactments. It is the province of the judge to expound the law, to declare public policy as he finds it in the unwritten and written law. Public policy is a proper ground for a decision only in the sense of the policy of the law, not in the sense of mere judicial notions as to what is best for the public good. An act [speaking of an act *inter partes*] is properly said to be illegal when it is contrary to the principles of established law.'

What we have said covers all the assignments of error gen-erally and in detail that are presented for consideration in the brief of appellant's counsel.

*By the Court.*—The judgment is affirmed.