[No. 2236, July 10, 1918.]

## CITY OF ALBUQUERQUE v. WATER SUPPLY CO.

### SYLLABUS BY THE COURT.

1. A submission by a city council to the voters of such city of a proposition to issue bonds in a stated amount for the

City of Albuquerque v. Water Supply Co., 24 N. M. 368.

purchase or erection of a system of waterworks for such city is not a double proposition, and does not fall within the rule announced in the case of Lanigan v. Gallup, 17 N. M. 627, 131 Pac. 997. Such a proposition is to be construed, in substance, as a proposition to acquire a waterworks system, either by purchase or construction.          P. 379

2. Section 3717, Code 1915, which requires that the notice of election for the purpose of voting upon a bond issue for the purpose of providing funds for the purchase or erection of a system of waterworks, shall be published "at least once a week for four consecutive weeks immediately prior to said election." Held, that a notice of election published once a week for four consecutive weeks, the last insertion being 13 days prior to the election, substantially complies with the statute.          P. 381

3. Where an election is held under authority of an order of the proper authorities, and in the main conforms to the requirements of the statute, though wanting in some particular not essential to the power to hold such an election, and is acquiesced in by the people and approved by their agent, such irregularities do not render the bonds thus issued void.          P. 381

4. Mere irregularity in connection with an election in the case of the notice will not of itself invalidate the election, but it must further be shown that, if the statute had been strictly complied with, the results would have been different.          P. 382

5. Section 3719, Code 1915, requires publication of a notice of sale of the bonds issued by a municipality for the purpose of providing funds for the purchase or erection of a system of waterworks, at least once each week for four consecutive weeks' immediately prior to the date of opening the bid. Held, that such statute is substantially complied with, although the last insertion of the notice is 11 days prior to the sale of the bonds.          P. 382

6. The government of a municipality is a continuing one, and, while the personnel of officers change, the office itself continues, and an act initiated by one individual as a city officer for and on behalf of the city may be completed by

his successor in office.    Held, that bonds properly signed
by officers of a city, who were such officers at the date of
signing the bonds, were not rendered invalid by reason of
the fact that the sale of the bonds was not concluded by
such officers, but by their successors in office.        P. 382

7.    Chapter 74 of the Laws of 1915, which requires the
approval of the state tax commission to a proposed increase
of the rate of taxation of a municipality, where such rate
amounts to more than 5 per cent. in excess of the amount
raised by tax levies within such municipality during the pre-
ceding year, has no application to levies made for the pur-
pose of providing funds for the payment of the principal
and interest on bonded indebtedness.    Hence it was not nec-
essary for the city of Albuquerque to secure the approval
of the state tax commission to the tax proposed to be laid
for the purpose of providing for the payment of the prin-
cipal and interest on bonds issued to purchase a waterworks
system.                                                  P. 384

8.    Section 3624, Code 1915, requires the mayor of a
city to indorse the word "Approved" on a resolution, ordi-
nance, or other legislative action of the city council and
to sign the same.    Held, that the word "Approved," follow-
ed by a blank line for the purpose of writing therein the
date of the approval, and signed by the mayor, complied
with the statute in this regard.                         P. 387

9.    A municipal corporation, created under an unconsti-
tutional charter, is a de facto corporation, and its officers
are de facto officers.    The existence of the corporation, and
its right to make contracts and transact business as such
corporation, cannot be raised collaterally.    The existence
of such municipality can only be questioned by the state
in a direct proceeding instituted by the Attorney General
for that purpose, and until the question is thus raised, and
an adjudication had ousting the corporation from exercise
of the franchise, all acts done and contracts made by the
officers of such a de facto municipality  are as valid and
binding upon it and the property within its limits as though
such officers were de jure officers of a de jure corporation.
For this reason it is unnecessary to determine the constitu-

City of Albuquerque v. Water Supply Co., 24 N. M. 368.

tionality of chapter 86, Laws 1917, under which the present charter of the city of Albuquerque was framed.     P. 388

10.   Incorporated cities, towns, and villages in the state of New Mexico have authority to purchase waterworks systems for the purpose of supplying water to the inhabitants of such city, town, or village.                        P. 404

Appeal from District Court, Bernalillo County; Raynolds, judge.

Suit by the City of Albuquerque against the Water Supply Company. Judgment for plaintiff, and defendant appeals. Affirmed.

A. B, McMILLEN, of Albuquerque, for appellant.

Tax levy for interest and sinking fund to pay principal at maturity must be provided for.

Sec. 29, Art. 4, State Const.; Sec. 12, Art. 9, Id.; Sec. 13, Art. 9, Id.

Was ordinance authorizing issue of bonds and submitting question to vote of people legal and sufficient.

Lanigan v. Gallup, 17 N. M. 627; Elyria G. & W. Co. v. Elyria, 49 N. E. 335; Farmer's L. & T. Co. v. City of Sioux Falls, 131 Fed. 890, 136 Fed. 721.

It has been frequently held, however, that such proposition is to be construed as in substance a proposition to acquire a water works system or other improvement, either by purchase or construction, and that such proposition is not invalid as either double or alternative.

Hartigan v. Los Angeles (Cal.), 149 Pac. 590; Clark v. Los Angeles, 160 Cal. 30; 116 Pac. Rep. 722; Clark v. Los Angeles, 160 Cal. 317, 116 Pac. 966; Nash v. Council Bluffs (Ia.), 174 Fed. 182; State v. Allen 178 Mo. 555, 77 S. W. 868; State v. Allen, 183 Mo. 283, 82 S. W. 102; Hurd v. Fairbury, 87 Neb. 745, 128 N. W.

638; Tulloch v. Seattle (Wash.), 124 Pac. 481; Wood v. Ross, 85 S. C. 309, 67 S. E. 449.

Some courts have been very strict with reference to the publication of the notice of election, and any variance has been held to be fatal to the election. Other courts have taken the view that mere irregularity in connection with the election, even in the case of the notice, will not of itself invalidate the election, but it must also be shown that if the statute had been strictly complied with the result would have been different.

Board of Education v. Citizen Nat. Bank, 167 Pac. 715; Ardmore v. State (Okla.), 104 Pac. 913; Phillips Investing Co. v. School District (Colo.), 144 Pac. 1129; Payne v. Port of Seattle (Wash.), 126 Pac. 628; Rands v. Clarke County (Wash.), 139 Pac. 1090; Washington County v. State (Ala.), 44 Southern, 465; Hearn v. Blount County (Ala.), 62 Southern 535; Hicks v. Crigbaum (Ariz.), 108 Pac. 482; Barry v. Board, 169 Pac. 314.

The objection is frequently made by bond attorneys, and was made in regard to this particular issue, that bonds must be executed by the officers who are in office at the very time of sale and delivery, and they cite as authority for that opinion the following cases:

Coler v. Cleburne, 131 U. S. 162; Anthony v. Jasper County, 101 U. S. 693; Wright v. Irrigation District, 138 Fed. 313; Young v. Clarendon, 132 U. S. 340; Town of Weyauwega v. Ayling, 99 U. S. 112; Lehman v. City of San Diego, 83 Fed. 669; Yesler v. City of Seattle, 25 Pac. 1014.

The following cases support the legality of bonds executed by officers who have retired from office prior to delivery, as in the case at bar:

O'Neill v. Yellowstone Irrig. Dist. (Mont.), 121 Pac. 28; Gage v. McCord, 5 Ariz. 227, 51 Pac. 977; Halsey v. Gillette, 156 Cal. 114, 103 Pac. 339.

Did city have power to purchase property of Water
Supply Company?

pp. 1665, 1666, Code 1915; Sec. 3564, clause 6, Code
1915; Sec. 3564, clauses 67, 68, 69, 70, 71, 73, 74, Code
1915; Secs. 3716 to 3722, Code 1915; 3 Dioon Mun.
Corps., 5th Ed., Sec. 1296.

W. A. KELEHER, of Albuquerque, for appellee.

Question submitted by ordnance was not dual in na-
ture.

Lanigan v. Gallup, 17 N. M. 627; Sec. 3716, Code
1915; Nash Co. v. Council Bluffs, 174 Fed. 162; Stern
v. Fargo, 122 N. W. 403, 26 L. R. A. (N. S.) 678; Linn
v. Omaha, 107 N. W. 983; State ex rel. Canton v. Allen,
77 S. W. 868; Ryan v. Tuscaloosa, 46 So. 638; Farm-
er's L. & T. Co. v. Sioux Falls, 136 Fed. 890.

Adequate and substantial notice of bond election was
given to voters.

Peterson v. Hansen, 107 N. W. 528; Meyers v. Dunn,
13 L. R. A. (N. S.) 881; City of Ardmore v. State, 104
Pac. 913; Town of Grove v. Haskell, 104 Pac. 56; El-
lis v. Karl, 7 Neb. 381; Dishon v. Smith, 10 Iowa, 212;
McCrary on Elections, par. 179; Board of Education v.
Citizens Nat. Bank, 167 Pac. 715.

Fact that bonds were issued and delivered by newly
elected officers is immaterial.

Sec. 3719, Code 1915; Gage v. McCord, 51 Pac. 977;
Yesler v. Seattle, 25 Pac. 1014; Young v. Claradon, 132
U. S. 340; O'Neill v. Yellowstone etc. Co., 121 Pac. 283;
Halsey v. Gillette, 156 Cal. 103.

For proposition as to levy of tax for interest and
sinking fund, see:

C. 74, L. 1915; Austin v. Seattle, 27 Pac. 557; Capi-
tal C. W. Co. v. Montgomery, 9 So. 343; Cconto v. Ocon-
to W. S. Co., 80 N. W. 1113; City of Ottumwa v. City

W. S. Co., 119 Fed. 315, 59 L. R. A. 604; Swanson v. City of Ottumwa, 59 L. R. A. 620; Sec. 12, Art. 9, State Const.; Sec. 29, Art. 4, Const. of N. M.

Act of legislature authorizing commission form of government was constitutional.

C. 86, Laws 1917; Eckerson v. Des Moines, 115 N. W. 177; State v. Ure, 135 N. W. 225; Eckerson v. Des Moines, 115 N. W. 183; State ex rel. v. Mankato, 41 L. R. A. (N. S.) 111; Bryan v. Voss, 136 S. W. 884.

Municipal corporations in New Mexico may acquire by purchase or otherwise system for supplying water to inhabitants.

Note, 61 L. R. A. 34; Lake Charles Ice Co. v. Lake Charles, 30 So. 289; Memphis v. Memphis Water Co., 5 Heisk 495; Grace v. Hawkinsville, 28 S. E. 1021; Ellinwood v. Reedsburg, 64 N. W. 885; McQuillan on Corps., Sec. 1782; Secs. 3716, 3721, Code 1915.

### OPINION OF THE COURT.

**ROBERTS, J.**  This suit was instituted in the court below by appellee against the appellant to compel appellant to accept $400,000 of bonds of the city of Albuquerque in payment for its pumping station, water mains, and certain other property used in connection with supplying the inhabitants of the city of Albuquerque with water. The refusal on the part of the appellant to accept the bonds and complete the contract hereinafter referred to was based solely upon objections raised to the validity of the bonds. This action was instituted by the city to compel appellant to comply with its contracts of sale and to accept the bonds in question in payment of the purchase price of the waterworks system.

The facts, briefly stated, are as follows: Proceedings for the issuance of $400,000 of bonds of the city of Albuquerque for the purpose of purchasing or erecting a system for supplying water to the city of Albuquerque

and its inhabitants were initiated in February, 1916, and the bonds were authorized by vote of such qualified electors of the city of Albuquerque as paid a property tax in said city during the preceding year, on April 4, 1916. On May 21, 1917, the appellant Water Supply Company, a corporation, which had theretofore owned and been operating a waterworks system for the city of Albuquerque, under a franchise, and the city of Albuquerque, through its common council, entered into a contract by which the Water Company agreed to sell, and the city agreed to buy, certain property of the Water Company described in said contract. The Water Company, on its part, agreed to accept the fair and reasonable cash value of said property as a going concern, to be determined by three disinterested expert engineers, trained in the valuation of public utilities such as the Water Supply Company, one to be chosen by the Water Company, one to be chosen by the city, and one to be chosen by the Chief Justice of the Supreme Court of New Mexico, the award of a majority of said arbitrators to be taken as the value of said property, and to be binding upon the parties, their successors and assigns; but it was provided, however, that the city should not be bound to purchase said property if the valuation fixed by the arbitrators should exceed the sum of $400,000. The arbitrators were chosen in the manner provided by the contract, and fixed the valuation of said property at the sum of $453,591. Prior to the contract in question, to-wit, on April 4, 1916, there had been submitted to the qualified electors of the city who had paid a property tax in said city during the preceding year, as stated, the question of the issuance of $400,000 of bonds of the city for the purpose of purchasing or erecting a system for supplying water. After the report filed by the arbitrators, the Water Company offered to donate to the city so much of the valuation as was in excess of $400,000 and to accept from the city the sum of $400,000 in full payment of such contract.

Thereupon a second contract was entered into by which the city and Water Company made a final contract, the former to buy and the latter to sell the property of the Water Company to the city for the sum of $400,000, and to deliver a deed for the property upon the payment of that sum; and it was further agreed that, at the designated time and place for the sale by the city of Albuquerque of the $400,000 bonds, the proceeds of which were to be used to finance the purchase by the city, the Water Supply Company would bid par and accrued interest to date of delivery for such bond issue, and carry out in good faith the obligation thereby incurred, in the event said bid should be accepted by the city. There were other matters in said contract not important in the consideration of the issues involved in this suit. The bonds were offered for sale on the 17th day of December, 1917, at which time the Water Company bid par and accrued interest for the same. There was no equal or higher bid for such bonds.

The complaint in the present suit set out the contract above referred to, and there was filed with the complaint a complete transcript of the proceedings for the issuance of said bonds. The appellant filed its answer, setting out in detail the legal objections urged against the validity of said bonds, and alleged its readiness to accept the same and convey said property, provided said bonds were adjudged to be legally issued and binding obligations upon the part of the city of Albuquerque. The bonds in question were dated December 1, 1917, and were duly executed by Henry Westerfeld as mayor, Thomas Hughes as city clerk, and Warren Graham as city treasurer, and it was admitted that they were such officers at the time of the execution of the bonds in question.

The legislature of 1917 enacted chapter 86, Laws 1917, which authorized cities having more than 10,000 inhabitants to adopt a charter providing for such a city such a form of government as might be deemed expedient and beneficial to the people, including the man-

ner of appointment or election of its officers. Albuquerque is a city of more than 10,000 inhabitants, and under this act adopted what is known as a commission form of government, under which an election was held, and three commissioners, provided for by the charter, were elected. These commissioners assumed office on the 4th day of December, 1917. The sale of the bonds had been advertised to take place on December 17, 1917, and the sale was conducted by the said commissioners. The lower court held that the bonds were legal and valid, and that the city was entitled to the specific performance of the contract. Appellant, in this court, presents the various objections relied upon in the lower court to the validity of the bonds, and they will be stated and considered in the order presented in appellant's brief.

Section 13 of article 9 of the state constitution, which limits the amount of indebtedness which a city, town, or village may contract, specifically exempts debts contracted for the purpose of the construction or purchase of a system for supplying water from the operation of the limitation. In other words, under the constitution there is no limitation imposed upon the amount of indebtedness which may be contracted for such purpose.

The bonds in question were issued under the provisions of sections 3716 to 3722, Code 1915, inclusive, which were enacted by the legislature in 1912, pursuant to the constitutional provisions regulating the issuance of bonds. Section 3716 authorizes any incorporated city, town, or village, "subject to the limitations and in accordance with the provisions of article IX of the constitution, to issue negotiable bonds for the purpose of securing funds for the construction or purchase of a system for supplying water, or of a sewer system for such city, town, or village." Section 3717 reads as follows:

"That before any bonds shall be issued, the city counsel or board of town or village trustees, as the case may be, shall cause the question of issuing such bonds to be sub-

mitted to a vote of such qualified electors thereof as have paid a property tax therein during the preceding year; said election to be hehld at the same time as a regular election for councilmen, aldermen or other officers of such city, town or village, by ballots deposited in a separate ballot box. Said city council or board of town or village trustees shall cause to be published at least once each week for four consecutive weeks immediately prior to said' election in a newspaper of general circulation published therein, or if no newspaper is published therein, shall caused to be posted not less than twenty-five not more than thirty days before said election, in not less than eight public places within such city, town or village, a notice of the time and place or places of holding such election, and the purpose or purposes for which such bonds are to be issued.

"The ballots cast at such election on said question shall have printed or written thereon the words, 'For waterworks (or sewer) bond issue,' or 'Against waterworks (or sewer) bond issue,' as the case may be; and such ballots shall be of uriform size and color."

Section 3718 has to do with the canvas of the vote and authorizes the issuance of the bonds in case a majority of those voting on the question shall have voted in favor of creating such debt. Section 3719 provides for the denomination of the bonds, rate of interest, and time of payment, and provides:

"And they. [the bonds] shall be signed by the mayor of any such city or town  *  *  *  and by the city, town or village clerk:  *  *  *  Provided, further, that such bonds shall be sold at not less than par and accrued interest to date of delivery, for cash only, to the highest and best bidder, after publication of notice at least once each week for four consecutive weeks immediately prior to the date of opening bids therefor in one newspaper published in or of general circulation in such city or town or village, and also ine one newspaper published at the state capital, and one leading financial newspaper published in the city of New York, state of New York, stating the amount, rate of interest, time of maturity and conditions of such bonds.  *  *  *"

Section 3720 is as follows:

"The city council or board of town or village trustees is hereby authorized and required to levy and collect upon all taxable property within such city, town or village subject to taxation, such taxes as may be necessary to pay the

City of Albuquerque v. Water Supply Co., 24 N. M. .368.

interest and principal of said bonds, and shall provide a proper sinking fund for the redemption of said bonds at maturity.''

Section 3721 is not important in the consideration of the questions involved herein.

[1] The first objection made to the validity of the bonds is that the ordinance authorizing the issue of bonds and submitting the question to the vote of the qualified electors contained a double proposition, and was therefore invalid under the decision by this court in the case of Lanigan v. Gallup, 17 N. M. 627, 131 Pac. 997. The ordinance in question follows the wording of the statute, and provides for the issue of $400,000 of the negotiable bonds of the city of Albuquerque, ''for the purpose of securing funds for the construction or purchase of a system for supplying water to the city of Albuquerque and its inhabitants.'' It provided that the ballots cast at such election should have printed thereon the words, ''For waterworks bond issue,'' and ''Against waterworks bond issue.'' These provisions seem to have followed the exact wording of the statute, but the question is raised as to whether or not it is legal to submit upon a single ballot the question of issuing bonds for the construction or purchase of a system for supplying water; in other words, whether it is submitting a double proposition.

Appellant argues that there is a division of authority upon the proposition, some courts holding that a submission to the electors of the proposition to issue bonds for the ''purchase or erection'' of waterworks system is a joint proposition, and such was held by the Supreme Court of Kansas in the case of City of Leavenworth v. Wilson, 69 Kan. 74, 76 Pac. 400, 2 Ann. Cas. 367; and by the Ohio Supreme Court in the case of Elyria Gas & Water Co. v. Elyria, 57 Ohio St. 374, 49 N. E. 335. The weight of authority, however, is to the effect that such a proposition is to be considered, in substance, as a proposition to acquire a waterworks system or other improvement either by purchase or con-

struction, and that such submission is not invalid as submitting either a double or alternative question. Hartigan v. Los Angeles, 170 Cal. 313, 149 Pac. 590; Clark v. Los Angeles, 160 Cal. 30, 116 Pac. 722; Clark v. Los Angeles, 160 Cal. 317, 116 Pac. 966; Nash v. Council Bluffs (C. C.) 174 Fed. 182; State v. Allen, 178 Mo. 555, 77 S. W. 868; State v. Allen, 183 Mo. 283, 82 S. W. 103; Hurd v. Fairbury, 87 Neb. 745, 128 N. W. 638; Tulloch v. Seattle, 69 Wash. 178, 124 Pac. 481; Wood v. Ross, 85 S. C. 309, 67 S. E. 449. In the Lanigan case there was clearly a double proposition submitted to the voters, viz. the issuance of bonds for the purpose of constructing a sewer system and water-works system. There the voters were required to vote bonds for both purposes if they desired either. The single purpose in view in the submission in the present case was the securing of a municipal water supply system for the city of Albuquerque and the issuance of bonds therefor. The manner of securing the system, either by purchase of the existing one or the erection of a new plant, was left with the city council, where it properly belonged.

The statute under consideration does not require the council to determine, in advance of the submission, whether it will buy or build a system, but authorizes the submission to the voters of the question as to whether bonds shall be issued for the purpose of purchasing or erecting, and the form of ballot clearly evidences this intention.

The proposition in the case at bar was not dual, nor was it stated in the alternative. It was but a single proposition, i. e., as to whether bonds should be issued for the purpose of creating a municipal owned water plant. The weight of authority and reason supports this view, and the bonds were not rendered invalid by the reason of the form of submission. And it was legal and proper for the voters to specify the maximum amount of bonds to be issued, delegating to the city council the proper exercise of discretion as to whether

or not, as a result of the final negotiations, the entire $400,000 of bonds should be issued.

[2] The second point urged against the validity of the bonds is that the notice of the bond election was not published in the manner required by law. Section 3717, Code 1915, requires that the notice of election shall be published "at least once each week for four consecutive weeks immediately prior to said election." The notice of election in this case was published March 1, 8, 15, and 22, 1916. The election was held April 4, 1916, and it is argued that this was not "immediately prior to said election," as required by law. This point is, on principle, disposed of by the opinion of this court in the case of Board of Education of Roswell v. Citizens' National Bank, 23 N. M. 205, 167 Pac. 715. The election there was for the purpose of voting bonds for the erection of a school building. The statute required that the notice of election should be published ten days before the election, in two newspapers, and that the notice should be inserted in daily newspapers six times prior to the date the election was to be held, but, when there was no daily newspaper published, then such notice should be inserted in a weekly newspaper and published in two issues prior to the date of election. The election in that case was held on April 3, 1917. The last publication in each of the two newspapers, one apparently a daily newspaper, and the other a weekly newspaper was March 24, 1917, the last publication being ten days before the election, and the question was raised that the statute intended that the notice of election should be published the required number of times within ten days next preceding the election. We said:

"This statute is, we think, directory and is sufficiently complied with, even though the first insertion of the notice may have been more than ten days before the election."

[3] In the case of Barry v. Board of Education of Clovis, 23 N. M. 465, 169 Pac. 314, while the point was not actually involved, we said:

City of Albuquerque v. Water Supply Co., 24 N. M. 368.

"Where an election is held under authority of an order of the proper. authorities, and in the main conforms to the requirements of the statute, though wanting in some particular not essential to the power to hold such an election, and is acquiesced in by the people and approved by their agent, such irregularities do not render the bonds thus issued void."

Following the rule laid down in these cases, we are of the opinion that section 3717, Code 1915, is substantially complied with when the last insertion of the notice was had 13 days prior to the election. There is no showing that any injury resulted by reason of the premature publication of the notice, and there is no evidence of any attempt to defraud or mislead any of the voters, and, apparently, all the voters of the city were fully advised as to the date of the election and the purpose thereof.

[4] Mere irregularity in connection with an election in the case of the notice, will not of itself invalidate an election, but it must further be shown that, if the statute had been strictly complied with, the result would have been different. City of Ardmore v. State, 24 Okl. 862, 104 Pac. 913.

[5] The third point is that the notice of sale of the bonds did not comply with the statute. Section 3719, Code 1915, requires publication of the notice of sale of bonds to be "at least once each week for four consecutive weeks immediately prior to the date of opening bids." The notice was published November 15, 22, 29; and December 6, 1917, while the time fixed for the sale of the bonds was December 17, 1917, a period of eleven days after the last publication. This question is disposed of by the discussion under point 2. The publication in question complied with the spirit of the statute, and no possible prejudice could have resulted from the manner in which the notice was published.

[6] The fourth point made against the validity of the bonds is that the officers who executed the bonds ceased to be such officers before the sale and delivery of the same. The bonds were dated December 1, 1917,

and were executed on that date by Henry Westerfeld as mayor, Thomas Hughes as clerk, and Warren Graham as treasurer, and they were such officers at the time of executing said bonds. They ceased to be such officers, or at least surrendered the offices of the city government to the commissioners elected under the new charter, on the 4th day of December, 1917. The sale was held, as stated, by the commissioners. The objection is made that bonds must be executed by the officers who are in office at the time of the sale and delivery, and the following cases are cited as authority: Coler v. Cleburne, 131 U. S. 162, 9 Sup. Ct. 720, 33 L. Ed. 146; Anthony v. Jasper County, 101 U. S. 693, 25 L. Ed. 1005; Wright v. Irrigation District, 138 Fed. 313, 70 C. C. A. 603; Young v. Clarendon, 132 U. S. 340, 10 Sup. Ct. 107, 33 L. Ed. 356; Town of Weyauwega v. Ayling, 99 U. S. 112, 25 L. Ed. 470; Lehman v. City of San Diego, 83 Fed. 669, 27 C. C. A. 668; Yesler v. City of Seattle, 1 Wash. 308, 25 Pac. 1014. These authorities, however, do not go to the extent claimed for them. For example, in the case of Coler v. Cleburne, supra, the party signing as mayor had ceased to be such officer before actually signing the bonds; and it is clear upon principles governing private corporations, as well as municipal corporations, that in order to bind a corporation the person who undertakes to perform an official act must be such officer at the very time he performs the act, and that he cannot at a subsequent date, when he is no longer the officer he assumes to be, legally execute an instrument by dating it back to a period when he was such officer.

Section 3719 of the Code of 1915 authorizing bond issues by municipal corporations, provides that "such bonds shall be issued" by the city council but does not provide, even by implication, that the bonds shall be sold and delivered by said council whose personnel is identical with that of the council authorizing the issue of the bonds. The statute required that bonds issued by the municipality "shall be sold at not less than par

and accrued interest to date of delivery," clearly recognizing that the execution of the bonds may precede their sale and delivery by a sufficient period of time to make it an object to require the sale to be for a sufficient amount to cover the par value of the bonds and accrued interest thereon. The government of a municipality is a continuing one, and, while the personnel of officers change, the office itself continues, and an act initiated by one individual as a city officer for and on behalf of the city may be completed by his successor in office. Upon this proposition, we believe there is no authority to the contrary. Thus, in the process of the issuance and sale of the bonds in question, it was legal and proper for the individuals in office to do such acts and things as were essential and proper to be done by them toward the execution and the sale of the bonds, and such acts were not invalidated by reason of the expiration of the term of the officer who performed the act before the completion of the sale of the bonds. Thus the bonds were not invalidated by reason of their being signed by the proper officers in office at the date of the execution of the same. This view is supported by the following cases: O'Neill v. Yellowstone Irrig. Dist., 44 Mont. 492, 121 Pac. 283; Gage v. McCord, 5 Ariz. 227, 51 Pac. 977; Halsey v. Gillett, 156 Cal. 114, 103 Pac. 339.

[7]    The fifth point is that it was necessary, for the valid exercise of the power to levy a tax for the interest and sinking fund of these bonds, to file a special request with the state tax commission, under chapter 74 of the Laws of 1915, and that the state tax commission should approve such levy. Section 29 of article 4 of the Constitution provides that no law authorizing an indebtedness shall be enacted which does not provide for the levy of a tax sufficient to pay the interest and for the payment at maturity of the principal; and section 12 of article 9 provides that no city, town, or village shall contract any debt except by an ordinance which shall be irrepealable until the indebtedness therein provided for shall be fully paid or discharged, and which shall

specify the purpose to which the funds to be raised. shall be applied, and which shall provide for the levy of a tax not to exceed 12 mills on the dollar upon all taxable property within such city sufficient to pay the interest on, and to extinguish the principal of, such debt within 50 years. Section 13 of article 9 of the Constitution limits the amount of indebtedness which a city may contract, except that such city may contract debts in excess of such limitation for the construction or purchase of a system for supplying water or a sewer system. Sections 3716 et seq., Code 1915, conform to these constitutional requirements. Section 12 of chapter 54 of the Laws of 1915 fixes the minimum rate of tax to be levied for city, town, or village purposes or uses at three mills on the dollar, but provides:

"The foregoing limitations shall not apply to levies for payment of the public debt or interest thereon."

Chapter 74 of the Laws of 1915, approved the same date as chapter 54, reads as follows:

"Section 1. No county, city, town, village, or school district shall in any year make tax levies which will, in the aggregate, produce an amount more than five per centum in excess of the amount produced by tax levies therein during the year preceding, except as hereinafter provided.
"Sec. 2. In case the amount desired to be produced by tax levies is more than five per cent. greater than the amount produced in the year preceding, such fact shall be set forth in the form of a special request and filed with the State Tax Commission. In case the State Tax Commission approve such proposed increase it shall specifically authorize the same; if it disapprove, it shall so state with its reasons therefor, and its decision shall be final."

In the case of Lanigan v. Town of Gallup, 17 N. M. 627, 131 Pac. 997, we held that the 12-mill levy limitation fixed by section 12 of article 9 of the Constitution did not apply to debts contracted for the purchase or construction of a system for supplying water. It would seem that inasmuch as section 12 of chapter 54, limiting the tax levies, provides that the limitation shall not

apply to levies for the payment of the public debt or interest thereon, and inasmuch as chapter 74 was approved on the same date, that there was no intention to limit the tax for the payment of the public debt or interest thereon by the provisions of chapter 74. In fact, it is apparent that chapter 74 was dealing with governmental expenditures. To give to chapter 74 the construction which would require the approval of the state tax commission of the proposed tax to be laid for the payment of the interest upon a bonded debt purposed to be created by a municipality, such debt having been authorized by vote of the people as required by the Constitution, would practically nullify the statute authorizing the creation of the indebtedness. The statutes in most instances leave it optional with the municipality issuing the bonds to fix the time when such bonds shall become due and payable and the provisions to be made for the levying of the tax. Waterworks bonds, for example, may be made due and payable at any time within 50 years after the date of their issuance. Suppose that the tax should be so laid, and the bonds become due and payable at such time and in such manner that it would provide for a gradual increase of the tax rate of 5 per cent. or more each year, the rate for other expenditures of the municipality continuing the same as for the preceding years. The state tax commission would approve the increase proposed for the first year. At the time of such approval no one could say that an additional increase the next succeeding year of 5 per cent. would be necessary, because there might be a decrease in the rate required for other purposes, hence it might be incumbent upon the municipality to secure the permission of the state tax commission the next succeeding year for the proposed increase, which might be granted or refused, and the construction of the statute which would require the approval of the state tax commission for the levy of the tax for the purpose of meeting the principal and interest on the public debt would destroy the market value of all municipal bonds issued in this state. We

City of Albuquerque v. Water Supply Co., 24 N. M. 368.

believe that chapter 74 has application only to tax levies for the ordinary expenditures of the county, city, town, village, or school district, and has no application to the levy of a tax for the purpose of providing a sinking fund and interest for bond issues voted by the people.

[8] The sixth objection made to the validity of the bonds is that ordinance No. 607 of the city of Albuquerque, providing for the issuance and form of the bonds, etc., was not valid because the ordinance was not approved by the mayor with his official signature, as required by section 3624, Code 1915. This section, so far as material, reads as follows:

"No resolution, ordinance or other legislative action of the council of cities or the trustees of towns shall be valid and effective unless endorsed 'Approved' by the mayor, with his official signature."

The parties, by stipulation, agreed that the court should examine the original ordinance, and upon examination we find that at the bottom of the right-hand side appears the signature of Henry Westerfeld, mayor of the city of Albuquerque, and the signature is attested by the city clerk, Thomas Hughes. To the left of the signature of the mayor appears, in typewriting, the following: "Approved————." It is further stipulated that the uniform practice in the adoption of ordinances in the city of Albuquerque was for the clerk or party who prepared the ordinance to place at the left of the place for the mayor's signature, upon approval of the ordinance, the word "Approved," followed by a blank line for the purpose of writing therein the date of the approval, and also providing for certain other memoranda to be made thereon, such as the date of recording, publication, etc.; that when the mayor disapproved an ordinance, he wrote thereon "Disapproved" or "Vetoed," and the date of his action; that there appeared upon this ordinance the word "Approved" in typewriting and the signature of the mayor. We think that this sufficiently complies with the statute. Certainly had the

clerk filled in the line at the right of the word ''Approved,'' showing the date of the approval, and this had been followed by the signature of the mayor, no one would contend that the statute had not been complied with. The omission of the date, we do not think, affects the validity of the ordinance, because this is shown by the minutes of the city council. For this reason we do not think there is any question as to the validity of the bonds on this ground.

[9]   The Seventh objection to the validity of the bonds is that the action of the Legislature in authorizing municipalities of a certain class or population to adopt a charter of its own making, subject to specific limitations, is unconstitutional, in that it is a delegation of legislative power. The Legislature, by chapter 86, Laws 1917, authorized cities having more than 10,000 inhabitants to adopt a charter providing for such system or form of government as might be deemed expedient and beneficial to the people, including the manner of appointment or election of its officers; provided that such charter shall not be inconsistent with the Constitution of the state, shall not authorize the levy of any tax not specifically authorized by the law of the state, and shall not authorize the expenditure of public funds for other than public purposes. It is argued that, under the rule announced by the following cases: Cleveland v. City of Watertown (N. Y.) 118 N. E. 501; State ex rel. Mueller v. Thompson, 149 Wis. 488, 137 N. W. 20, 43 L. R. A. (N. S.) 339, Ann. Cas. 1913C. 774; Elliott v. Detroit, 121 Mich, 611, 84 N. W. 820; Dexheimer v. Orange, 60 N. J. Law, 111, 36 Atl. 706—the unconstitutionality of the act is clearly apparent; hence the city of Albuquerque, as now constituted, under the charter adopted pursuant to the legislative act, has no existence, consequently is without power to complete the contract entered into by the appellant and the former city of Albuquerque; that any bonds delivered by it would be without validity; therefore it could not require appel-

lant to complete the transaction provided for by the contract.

Counsel for the city contends, however, that it is neither necessary nor proper for the court to determine in this proceeding the question as to the constitutionality of the act under which the present charter was adopted by the city; that, to say the least, the city of Albuquerque is a de facto corporation, and the acts of the city commissioners under the charter adopted in pursuance of said chapter 86 are valid and binding, and the authority exercised by them under the charter must prevail and be respected until the Attorney General interposes by quo warranto and secures the actual ouster of the incumbents in office or the dissolution of the corporation.

It is proper that we should first examine this contention, because, if it is sustainable, the constutionality of the act in question becomes of no importance in this action.

It must be conceded that there is very eminent authority supporting the proposition that there cannot be a corporation de facto under a statute which is unconstitutional. This doctrine is built upon the proposition that an unconstitutional statute is absolutely void, that it confers no rights, imposes no duties, affords no protection, and creates no office, and is in legal contemplation as inoperative as though it had never been passed. An examination of the cases supporting the rule that the corporate existence of a municipality or corporation created under an unconstitutional statute can be questioned in a collateral proceeding take as authority for the proposition the statement made by Mr. Justice Field in the case of Norton v. Shelby County, 118 U. S. 425, 6 Sup. Ct. 1121, 30 L. Ed. 178. At the outset of the discussion, however, it is advisable to examine the facts in that case, for an expression by the supreme Court of the United States is always entitled to the highest consideration and respect. Norton v. Shelby County involved the validity of bonds issued by the board of commissioners of Shelby county, Tenn., in payment of a

subsription by the county to stock in a railroad company. The original act of the legislature under which the bonds were issued authorized the county court of any county through which the railroad in question might run to subscribe to its capital stock. Subsequently the legislature organized the city of Memphis, and enacted that the powers theretofore vested in the quarterly court should be vested in a board of commissioners created by that act. The subscription was made by such board. The latter act was held by the Supreme Court of Tennessee to be unconstitutional and invalid, and the board created by it to have no legal existence. The duties conferred upon the board of commissioners created by the legislative act had been lodged in a county court, or quarterly court, as it was sometimes called, composed of justices of the peace elected in different districts by the constitution of Tennessee. In the state courts the validity of this act superseding the county court was at once assailed as in violation of the constitution of the state, by the justices of the peace of the county in their official character and as private citizens and taxpayers, and the state court held the act creating the board of county commissioners to be unconstitutional. This case, it is to be observed, did not involve the corporate existence of a municipality, but simply the power of the legislature to confer upon a board created by it certain rights and duties which would, by the constitution, inhere in others; hence it cannot properly be said that the case is authority for the proposition that a collateral attack will be entertained by the courts upon the constitutionality of an act of the legislature creating a municipality. The following cases are cited and relied upon as authority for the proposition that there cannot be a corporation de facto under the statute which is unconstitutional, and that the question can be raised collaterally: Brandenstein v. Hoke, 101 Cal. 131, 35 Pac. 562; Wilmington v. Addicks, 8 Del. Ch. 310, 43 Atl. 297; Georgia So. & F. R. Co. v. Trust Company, 94 Ga. 306, 21 S. E. 701, 32 L. R. A. 208, 47 Am.

St. Rep. 153; Imperial Building Co. v. Chicago Open Board of Trade, 238 Ill. 100, 87 N. E. 167; Clark v. American, etc., Coal Co., 165 Ind. 213, 73 N. E. 1083, 112 Am. St. Rep. 217; People v. Hamill, 134 Ill. 666, 17 N. E. 799, 29 N. E. 280; Winget v. Quincy Building Assoc., 128 Ill. 67, 21 N. E. 12; Marion Trust Co. v. Bennett, 169 Ind. 346, 82 N. E. 782, 124 Am. St. Rep. 228; Sisters of Charity of St. Elizabeth v. Morris Railroad Co., 84 N. J. Law, 310, 86 Atl. 954, 50 L. R. A. (N. S.) 236; Eaton v. Walker, 76 Mich. 579, 43 N. W. 638, 6 L. R. A. 102; Town of Winneconne v. Village of Winneconne, 111 Wis. 10, 86 N. W. 589; Etowah Light & Power Co. v. Yancey (C. C.) 197 Fed. 845; Huber v. Martin, 127 Wis. 412, 105 N. W. 1031, 1135, 3 L. R. A. (N. S.) 653, 115 Am. St. Rep. 1023, 7 Ann. Cas. 400. A consideration of these cases will show that in very few of them was involved the question of the corporate existence of a municipality, most of the cases relating to attacks upon the de facto existence of private corporations.

Brandenstein v. Hoke, supra, involved the question as to whether or not a levee district was a de facto corporation. The court held the act creating the levee district unconstitutional, and, this being true, there was no law in California under which such a corporation could be formed. The court in the opinion cites the case of Norton v. Shelby County, 118 U. S. 442, 6 Sup. Ct. 1121, 30 L. Ed. 178.

Wilmington v. Addicks, supra, however, is not authority, because the point was not involved in the decision. The court says:

"The authorities are a unit in deciding that there can be no de facto corporation when there is no possibility of the existence of a corporation. In such cases, corporate existence claimed can always be questioned in any proceeding."

In Georgia Southern R. Co. v. Trust Company, supra, there was a general law for the incorporation of railroad companies. The railroad company was incor-

porated under a special charter, which was attacked on the ground that the act was unconstitutional. The court held, however, that the railroad company was nevertheless a corporation de facto. This case is only authority upon the point that, where there cannot lawfully be a corporation de jure, there cannot be one de facto. Justice Lumpkin says:

. "We may assume, without any further citation of authorities, and without attempting any argument on the subject, that where the existence of a corporation of a given kind is positively forbidden by law, or where there is no valid, constitutional law authorizing the creation of such a corporation, it cannot exist, even as a corporation de facto. The rule thus stated does not, by any means, however, negative the soundness of the proposition that an organization assuming to be a corporation de jure, but for sufficient reasons not so in fact, may be a corporation de facto, when it is of such a character that it could, under existing laws, have full and complete corporate being and powers."

He further says, speaking of the broad character under which the corporations were formed:

"If the laws under which they proceeded were not good, they may, in our judgment, avail themselves of the existence of a general law on our statute book, and of its terms, at least so far as to enable them to be regarded as de facto corporations, because they have done practically what that general law required, though not actually following it nor professing to do so."

Imperial Bldg. Co. v. Board of Trade, supra, involved the de facto character of a corporation formed for the purpose of acquiring real estate and erecting buildings thereon. There was no law in Illinois authorizing the formation of such a corporation. The court held that the corporation so attempted to be formed was not a de facto corporation.

The case of People ex rel. v. Hamill, supra, cited as authority, is not in point, as no such question was involved in the case.

Winget v. Quincy Bldg. Assoc., supra, while cited as authority in support of the contention, would seem to be the other way. The author says:

"A party who has contracted with a corporation de facto as such cannot be permitted, after having received the benefits of his contract, to allege any defect in the organization of such corporation, as affecting its capacity to enforce such contract, but all such objections, if valid, are available only on behalf of the sovereign power of the state. * * * And this rule applies even where the corporation is organized under a law alleged to be unconstitutional."

Clark v. American, etc., Coal Co., supra, involved the existence of a private corporation and supports the rule contended for. The court says after discussing the proposition:

"It necessarily follows that there cannot be a corporation de facto under an unconstitutional statute, for such a statute is void, and a void law is no law."

The court does not discuss the question as to whether an unconstitutional statute is color of law.

Marion Trust Co. v. Bennett, 169 Ill. 346, 83 N. E. 782, 124 Am. St. Rep. 228, is in accord with the case of Clark v. American, etc., Coal Co.

In the case of Sisters of Charity of St. Elizabeth v. Morris Railroad Company, supra, the court held that, in a proceeding by the railroad company to condemn land, the court would, under certain circumstances, in the condemnation proceeding inquire in to the fact as to whether or not the railroad company was a de facto corporation.

Eaton v. Walker, supra, presents a case where a private corporation was formed to engage in the mercantile business under an unconstitutional statute. The court held that it was not a de facto corporation and that a private individual could raise the question.

In the case of Skinner v. Wilhelm, 63 Mich. 568, 30 N. W. 311, the act under which a corporation was

formed was held unconstitutional, and the right of the receiver of the corporation to recover a stock assessment was denied, but no point was made as to the de facto character of the corporation.

The case of Huber v. Martin, supra, involved the de facto existence of a private corporation. The court held that the act under which it was formed was unconstitutional, and that an unconstitutional law was not sufficient to support even a de facto corporation.

Town of Winneconne v. Village of Winneconne, supra, involved the corporate existence of a village. The court held that the act under which the village was incorporated being unconstitutional, it was not even a de facto corporation.

In the case of Etowah Light & Power Co. v. Yancey, supra, the company brought suit to condemn land owned by Yancey. Yancey demurred on the ground that the act under which plaintiff was incorporated was unconstitutional, and the court so held and sustained the demurrer. The question of the de facto existence of the corporation was not discussed or referred to.

It is thus to be seen that, of the cases referred to, only one involved the corporate existence of a municipality, the remaining all raising questions as to the corporate existence of private corporations, and upholding the right of an interested party to question collaterally the constitutionality of the act under which such corporations were formed. On the other hand, we find many well-considered cases holding that, where a municipality is created by a statute, such statute, although it may be unconstitutional, affords color of law and is immune against a collateral attack; that the validity of the law creating it can only be raised by a direct proceeding, instituted by the Attorney General on behalf of the state; that so long as the state does not question the right of the municipality to exist, its acts and doing are valid and binding. The reason for the rule is stated to be public policy or public necessity. There are many well-considered cases upholding this view.

City of Albuquerque v. Water Supply Co., 24 N. M. 368.

In the case of Wright v. Kelley, 4 Idaho, 624, 43 Pac. 565, after announcing the rule that the question of validity or invalidity of the municipal corporation can be raised only by the state by an action in quo warranto, the court says:

"The reason for this rule is apparent and plain to the most ordinary understanding. If one individual in a suit for the enforcement of a private right may raise the constitutionality of the organization of a county, another may do so, and this may extend to one hundred individuals, each thinking he has a new or better reason to present to the court why it should declare the law organizing a county unconstitutional, and thus the constitutionality of the law would continually be before the court in the most trivial suits, and the decision in none of the cases would be authoritative to destroy the de facto existence and organization of the county, because neither the county nor the state would or could be legally a party in any of the suits; and thus the public, consisting of all the citizens of the county or of the state, in no sense a party to the litigation, would have the validity of their corporate existence determined, or attempted to be determined. And the rule, we apprehend, would be no different if the Constitution itself prescribed the manner of incorporation."

In this case it was contended that the act creating the county was unconstitutional.

In Clapp v. Otoe County, 104 Fed. 473, 45 C. C. A. 579, bonds had been issued upon the vote of the elector of a named precinct in Otoe county. One ground of defense was that the precinct was illegally constituted. Judge Sanborn, speaking for the Circuit Court of Appeals, said:

"There is another reason why the defense which we have been considering cannot be sustained. It is that the general acquiescence by the inhabitants of a political subdivision, organized under color of law, and by the departments and officers of the state and county having official relations with it, gives to the acts and contracts of those officers on its behalf as a subdivision de facto all the force and validity of their acts in its behalf as a subdivision de jure. The acts of ordinary municipal bodies organized under color of law depend far more upon general asquiscence than upon the legality of their action or the existence of every condition precedent prescribed by the statutes under which they organize and act. The interests of the public which

depend upon such municipalities and their various sub-divisions, the rights and the relations of private citizens which become fixed in reliance upon their existence, the injustice and confusion which must result from an ex post facto avoidance of their acts, commend the justice and demand the enforcement of the rule that, when a municipal body or a political subdivision of a state or county has, or its officers have, assumed, under color of authority, and have exercised for a considerable period of time, with the consent of the state and its citizens, powers of a kind recognized by the organic law, neither the corporation, sub-division, nor any private party can, in private litigation, question the legality of the existence of the corporation or subdivision."

The court then quotes approvingly from the case of Speer v. Board, 88 Fed. 749, 32 C. C. A. 101. Certiorari was denied by the Supreme Court of the United States in 180 U. S. 638, 21 Sup. Ct. 920, 45 L. Ed. 710.

State ex rel. v. Blair, 245 Mo. 680, 151 S. W. 148, was an action to collect drainage taxes. Blair defended on the ground that (1) only two of the viewers appointed by the court to examine the land sought to be drained reported in favor of the necessity, etc., while the third viewer reported adversely; and (2) that section 5581, R. S. 1909, was unconstitutional, in that the notice therein prescribed was not due process of law. The court said:

"Neither of the issues thus tendered can avail defendant in this action, because a drainage district is a public corporation, and the legality of its organization and the sufficiency of its corporate existence cannot be inquired into in this collateral action."

In Burkhard v. Pa. Water Co., 234 Pa. 41, 82 Atl. 1120, the Supreme Court approved the opinion of the lower court, which said:

"It has been uniformly held that the validity of a charter for a public purpose cannot be determined in a collateral proceeding by a private suitor. It can only be done in a direct proceeding in which the commonwealth is a party."

In Wright v. Phelps, 89 Vt. 107, 94 Atl. 294, the court says:

City of Albuquerque v. Water Supply Co., 24 N. M. 368.

"And the courts go so far as to hold that, so long as the state ‘does not see fit to interfere and terminate the existence thereof by direct proceeding, a municipal corporation which has been created under the provisions of an unconstitutional statute may exercise upon the citizen, through its officers, the powers conferred upon it by statute, as fully and completely as if it was created by a law valid in every particular. The reason is that, until the state institutes proceedings by which the organized municipal government ‘is overturned and suppressed, it is de facto, and the public functions with which it is charged, within the scope of its apparent powers may be lawfully exercised by its officials as de facto officers.’ "

In Shapleigh v. San Angelo, 167 U. S. 646, 17 Sup. Ct. 957, 42 L. Ed. 310, it is said to be the general rule that the state, being the creator of municipal corporations, is the proper party to impeach the validity of their creation; that, if the state acquiesces in the validity of the muncipal corporation, its corporate existence cannot be collaterally attacked.

In Graham v. City of Greenville, 67 Tex. 62, 2 S. W. 742, it is said that, if the municipality has been illegally constituted, the state only can take advantage of the fact, and in a proceeding instituted for the purpose of testing the validity of its charter.

In Inhabitants of Fredericktown v. Fox, 84 Mo. 59, the defendant offered to show that the plaintiff was not a corporation, but the court would not permit it, and said that such a question could be raised by the state itself, and that a private person cannot, directly or indirectly, usurp this function of government.

In the case of State v. Rich, 20 Mo. 393, Rich was indicted by the grand jury of Stone county. He moved to quash on the ground that the act creating Stone county, where the indictment was found, was unconstitutional. The court held that it could not inquire into the matter in a collateral way, that it could only be determined in a direct proceeding instituted by the state, saying:

"Any other course would, it seems to us, be impracticable, and, if practicable, full of intolerable inconveniences, and against all reason."

In the case of Wendt v. Berry, 154 Ky. 586, 157 S. W. 1115, 45 L. R. A. (N. S.) 1101, Ann. Cas. 1915C, 493, it is held that where a city government is organized under a statute subsequently declared unconstitutional, persons who, during the existence of the city government, received benefits from public improvements contracted for by the city authorities may not escape the payment of the amount due the contractor for the benefits on the sole ground that the city government was void, in that the persons acting as its officers were without authority to create any enforceable demand growing out of contracts entered into by them, for the officers were de facto officers.

In the case of Nagel v. Bosworth, 148 Ky. 807, 147 S. W. 940, it is held that the acts of the circuit judge appointed under an unconstitutional statute, performed before the statute was declared unconstitutional, were valid.

In the case of Coast Co. v. Spring Lake, 56 N. J. Eq. 615, 36 Atl. 21, the court said:

"No matter how clearly unconstitutional are the provisions of the general act providing for the organization of a municipality, no matter if in some other suit similar statutes or the same statute have been decided to be inimical to the Constitution, nevertheless such a municipality is a de facto corporation until its municipal existence is annulled by a direct proceeding instituted for that purpose."

And further:

"After the corporation has been organized its existence can be called in question only by information in the nature of a writ of quo warranto allowed by permission of the Attorney General. No unconstitutional feature in the scheme provided by the Legislature for the institution of such a municipal corporation can be made a ground for refusing to recognize the corporate function of a municipality so created when the corporate existence is involved in a collateral proceeding."

City of Albuquerque v. Water Supply Co., 24 N. M. 368.

The same view is adhered to by the court in the cases of Attorney General v. Town of Dover, 62 N. J. Law, 138, 41 Atl. 98; Lang v. Mayor, etc., City of Bayonne, 74 N. J. Law, 455, 68 Atl. 90, 15 L. R. A. (N. S.) 93, 122 Am. St. Rep. 391, 12 Ann. Cas. 961; Meyer v. Somerville Water Co., 82 N. J. Eq. 572, 89 Atl. 545; Morris v. Fagin, 85 N. J. Law, 617, 90 Atl. 267; Devlin v. Wilson, 88 N. J. Law, 180, 96 Atl. 42; and La Monte v. Lurich, 86 N. J. Eq. 26, 100 Atl. 1031.

In the case of City of Topeka v. Dwyer, 70 Kan. 244, 78 Pac. 417, the court held that the constitutionality of the statute for the enlargement of the corporate areas of cities, apparently regular in form and fairly indicative of the legislative will, cannot be collaterally attacked in a prosecution for the enforcement of a city ordinance within territory annexed by virtue of proceedings authorized by such statute. The court says, after quoting from Cooley's Const. Lim., to the effect that the courts will not permit the corporate character of a corporation to be questioned collaterally if it appears to be acting under color of law and recognized by the state as such, and from other authorities to the same effect:

"These general statements are inconclusive, however, because the expression 'color of law' needs definition; and the question still remains, will an invalid statute or a statute invalid for particular reasons, afford 'color of law'? If the legally equivalent phrase, 'mere semblance of legal right' (7 Cyc. 401), be substituted, there is stable ground for asserting that a statute apparently complying with the forms prescribed by the Constitution for its enactment, and containing an intelligible declaration of the legislative will with respect to some matter fairly within the range of legislative cognizance, does make a semblance, a show, an appearance, of legal right. The argument, however, is frequently made that without a law there can be no organization or annexation, and that an unconstitutional law is no law; and from these premises it is, of course, a short cut to the conclusion that annexation under an unconstitutional statute is utterly void and may be collaterally attacked at any time.

"This reasoning utterly ignores the foundation of the rule forbidding collateral question of the existence of municipal corporations. The rule rests wholly in expedi-

City of Albuquerque v. Water Supply Co., 24 N. M. 368.

ence, and operates in defiance of other legal doctrines. The consequence to society of allowing private collateral attacks upon the existence of cities would be intolerable, and hence courts are concerned with the question, not if there exists a valid law, but if considerations of the public welfare shall forbid any inquiry as to whether or not there is a valid law; not if constitutional limitations have been transgressed, but if the public tranquility and the effective administration of government require that the matter of validity or invalidity shall be ignored, and a situation of affairs be arbitrarily recognized as if it were legal, whether in fact it be so or not."

The court held that, even though the statute authorizing annexation of adjoining territory was unconstitutional, that the question could not be raised save by the state by a direct proceeding.

In the case of Ashley v. Board of Supervisors, 60 Fed. 55, 8 C. C. A. 455, the court said:

"An unconstitutional and void law may yet be color of authority to support, as against anybody but the state, a public or private corporation de facto, where such corporation is of a kind which is recognized by, and its existence is consistent with, the paramount law, and the general system of law in the state."

In Miller v. Perris Irrigation District (C. C.) 85 Fed. 693, the organization of the irrigation district was challenged as unconstitutional in a collateral proceeding. The United States Circuit Court for the Southern District of California said:

"The rule, sustained by the overwhelming current of authorities, and based on considerations of public policy, is that, where a reputed corporation is acting under forms of law, unchallenged by the state, the validity of its organization cannot be drawn in question by private parties. Corporate franchises are grants of sovereignty only, and, if the state acquiesces in their usurpation, individuals will not be heard to complain. Neither the nature nor extent of an illegality in its organization can affect the existence of a reputed corporation, if the requisites just stated are present; that is, if such corporation be acting under color of law, and the state makes no complaint."

In the case of Riley v. Garfield Township, 58 Kan. 299, 49 Pac. 85, the court held that, until the dissolution

of Garfield county in an action of quo warranto brought by the attorney general for that purpose, the acts of all its officers were valid and binding, notwithstanding the unconstitutionality of its organization.

In Dillon on Municipal Corporations (5th Ed.) § 67, the author says:

"Where a reputed corporation is acting under forms of law, unchallenged by the state, neither the nature nor the extent of any illegality in the organization can affect the existence of the reputed organization. * * * Even if the illegality in the organization arises from the unconstitutional character of the statute purporting to authorize the organization, it is nevertheless a corporation de facto, if its nature be such as is recognized by the general system of law of the state."

In Speer v. Board of County Commissioners, 88 Fed. 749, 32 C. C. A. 101, the court said:

"We are unable to yield our assent to the broad proposition that there can be no de facto corporation under an unconstitutional law. Such a law passes the scrutiny and receives the approval of the Attorney General, of the lawyers who compose the judiciary committees of the state legislative bodies, of the Legislature, and of the Governor, before it reaches the statute book. When it is spread upon that book, it comes to the people of a state with the presumption of validity. Courts declare its invalidity with hesitation, and after long deliberation and much consideration, even when its violation of the organic law is clear, and never when it is doubtful. Until the judiciary has declared it void, men act and contract, and they ought to act and contract, on the presumption that it is valid; and where, before such a declaration is made, their acts and contracts have affected public interest or private rights, they must be treated as valid and lawful. The acts of a de facto corporation or officer under an unconstitutional law before its invalidity is challenged in or declared by the judicial department of the government cannot be avoided, as against the interest of the public or of third parties, who have acted or invested in good faith in reliance upon their validity, by any ex post facto declaration or decision that the law under which they acted was void."

The case of State of Iowa v. City of Des Moines, 96 Iowa, 521, 65 N. W. 818, 21 L. R. A. 186, 59 Am. St. Rep. 381, was a direct attack by the state upon the con-

stitutionality of the act providing for the annexation of contiguous territory by the city of Des Moines. The court held that the act was void as being a violation of the constitutional provision in regard to special and local legislation, yet the court held that the act was color of law for the annexation and for the application of the principles of estoppel.

In the case of Chicago, St. Louis & N. O. R. Co. v. Town of Kentwood, 49 La. Ann. 931, 22 South. 192, the court held that the constitutionality of the legislative act providing the method of creating municipal corporations and the organization of the municipal corporation under the act could not be attacked collaterally by the defendant resisting tax claimed by the corporation. See, also, Coxe v. State, 144 N. Y. 396, 39 N. E. 400; State v. Gardner, 54 Ohio St. 24, 42 N. E. 999, 31 L. R. A. 660; Coe v. Gregory, 53 Mich. 19, 18 N. W. 541; McCain v. Des Moines, 128 Iowa, 331, 103 N. W. 979.

Judge Cooley says (Cooley's Const. Lim. 363.) :

"In proceedings where the question whether a corporation exists or not arises collaterally, the courts will not permit its corporate character to be questioned, if it appear to be acting under color of law, and recognized by the state as such. Such a question should be raised by the state itself, by quo warranto or other direct proceeding."

Color of law has been defined to be "the appearance or semblance, without the substance, of legal right; mere semblance of legal right." 11 C. J. 1225.

The question has never been heretofore before the courts of this state, and we are free to adopt that policy and rule of law which is calculated to best subserve the interests of the state and its people. Here we have a statute which, to say the least, has the appearance of a valid law, enacted by the legislature, the branch of the state government charged with the creation of municipal corporations, under which an existing municipal corporation was given the right to reincorporate under the new statute, which its people did in good faith. The officers of the old municipality, relying upon the validi-

ty of the act, voluntarily surrendered their offices, and turned over the money and property of the city and the management of its affairs to the officers elected under the charter adopted pursuant to the new enactment. These new officers, in the utmost good faith, have administered the affairs of the city, have spent its money, levied taxes, enacted ordinances under which perhaps people have been imprisoned. The county treasurer has collected the city taxes, and, relying upon the validity of the act, has turned over to the city commissioners the money. Contracts have been made by the new city government, property acquired and used for the benefit of the city, and obligations are outstanding, signed by the officers under the new charter. If we should apply the rule adopted by some of the courts, and hold that the doctrine announced by Mr. Justice Field in the Norton-Shelby County case, supra, applies, we would destroy the only existing government in Albuquerque. Chaos and disorder, confusion and endless litigation, would result, and bankruptcy and ruin would possibly confront the county treasurer, who had paid over to the supposed officers of the city, in the utmost good faith, money which he justly assumed the commissioners were entitled to receive. Further, the terms of office of the mayor and one-half of the old councilmen have expired. There would not even be a quorum left to transact the business of the city and to fill the vacancies existing in the old offices.

In view of the foregoing, it is clear that the court should not adopt a rule of law which would bring about such results, unless required to do so by the most cogent reasons. As stated, the present municipal corporation was organized under sanction of a legislative act, which, at least, was color of law. If the act is invalid, we have a pretended municipal corporation usurping a franchise belonging to the state. No one but the state is injured by the usurpation, and it alone should be entitled to question the authority of the municipality which

it has permitted to organize, take over the government of the city, and incur obligations, make contracts, etc.

Whether the question of the constitutionality of the charter could have been raised by private individuals or at the time the new corporation took over the government of the city need not be determined, nor are we required to express any opinion upon the question as to whether the same rule should be applied to a private corporation. We are alone concerned with the endeavor to find the proper rule to be applied to a municipal corporation under the circumstances presented in this case. We agree with those authorities that hold that a municipal corporation created under an unconstitutional charter is a de facto corporation, and that its officers are de facto officers; that the existence of the corporation and its right to make contracts and transact business as such corporation cannot be raised collaterally; that it can only be questioned by the state in a direct proceeding, instituted by the Attorney General for that purpose; that until the question is thus raised and an adjudication had ousting the corporation from the exercise of the franchise, all acts done and contracts made by the officers of such a de facto municipality are as valid and binding upon it and the property within its limits as though such officers were de jure officers of a de jure corporation. For this reason we decline, in this case, to pass upon the question of the constitutionality of the legislative act in question.

[10] It is lastly urged that there is a question as to whether or not the city had the power to purchase the property of the Water Supply Company. Section 3716, Code 1915, provides:

"That any incorporated city, town or village is hereby authorized and empowered, subject to the limitations and in accordance with the provisions of article IX of the Constitution, to issue negotiable bonds for the purpose of securing funds for the construction or purchase of a system for supplying water, or of a sewer system for such city, town or village."

It will thus be seen that under this section an incorporated city is given authority to issue negotiable bonds for the purpose of securing funds for the construction or purchase of a system for supplying water. In 3 Dillon on Municipal Corporations (5th Ed.) § 1296, the author says:

"The nature of the service, and the urgent necessity of furnishing it to a municipality, have led the courts to infer the power to provide it from any fair grant of power to which it may be said to be naturally incident; e. g., the general power of a city in respect to police regulations, the preservation of the public health, and the general welfare, includes authority to use the usual means of carrying the power conferred into effect; and inasmuch as water and light are inseparably bound up with each of these matters, such authority, by implication, authorizes the city to construct municipal water and light works, if in so doing it contravenes no constitutional or statutory provision."

The section of the statute quoted in connection with clause 67, § 3564, which authorizes the erection and operation of gas and electric works by cities, and to provide means for protection from fire, and to issue and sell bonds for the purpose, clearly confers upon cities and towns the power and authority to purchase a system of waterworks.

Upon the whole we find no valid objection to the validity of the bonds in question, and for this reason the judgment of the court below will be affirmed, and it is so ordered.

HANNA, C. J., and PARKER, J. concur.